**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

CHI MAK, aka Seal A; Jack Mak;
Taichi Mak; Daichi Mak; Dazhi
Mai,

            *Defendant-Appellant.*

No. 08-50148

D.C. No.
8:05-cr-00293-
CJC-1

OPINION

Appeal from the United States District Court
for the Central District of California
Cormac J. Carney, District Judge, Presiding

Argued and Submitted
April 12, 2012—Pasadena, California

Filed June 21, 2012

Before: Betty B. Fletcher, Andrew J. Kleinfeld, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

7371

**COUNSEL**

Sean K. Kennedy, Kurt Mayer (argued), Los Angeles, California, for the defendant-appellant.

Andre Birotte, Jr., Denise D. Willett, Gregory W. Staples (argued), Santa Ana, California, for the plaintiff-appellee.

---

**OPINION**

M. SMITH, Circuit Judge:

Chi Mak (Mak) appeals his jury conviction of conspiring to violate export control laws and attempting to export a defense article to the People's Republic of China, in violation of the Arms Export Control Act (AECA), 22 U.S.C. § 2778, as implemented by the International Traffic in Arms Regulations (ITAR), 22 C.F.R. §§ 120-30. Following his conviction, Mak moved for a new trial, challenging the Government's failure to timely disclose its intended use of a particular expert witness, and claiming that the AECA is unconstitutionally vague. The district court denied Mak's motion. Mak now appeals his conviction, claiming violations of his rights under the First, Fifth, and Sixth Amendments, and the Ex Post Facto Clause.

We affirm the district court because: (1) the AECA and its implementing regulations do not violate Mak's First Amendment rights since the AECA is substantially related to the protection of an important governmental interest; (2) the court's instructions to the jury concerning technical data did not violate Mak's Due Process rights because they expressly required the Government to prove that the documents at issue are not in the public domain; (3) the court's instructions to the jury on willfulness did not violate Mak's Sixth Amendment rights because they did not prevent the jury from fully deliberating as to whether Mak acted willfully, as required by the AECA;

and (4) the documents at issue were covered by the United States Munitions List (USML) at the time Mak attempted to export them and, therefore, his conviction does not violate the Ex Post Facto Clause.

## STATUTORY SCHEME

The AECA regulates the export and import of "defense articles" and "defense services" out of and into the United States. 22 U.S.C. § 2778. Section 2778(a) of the AECA authorizes the President: (1) to designate those defense articles and services to be included on the USML; (2) to require licenses for the export of items on the USML; and (3) to promulgate regulations for the import and export of such items on the USML. *Id.* The Directorate of Defense Trade Controls (DDTC), within the United States Department of State, promulgates regulations under the AECA, known as ITAR. 22 C.F.R. § 120-30. ITAR defines the USML, which consists of twenty-one categories of designated defense articles and services that are subject to licensing controls under the AECA. *Id.* at § 121.1. Unless an exception applies, ITAR requires a license for the export of USML articles and related technical data. 22 C.F.R. §§ 123-125.

ITAR defines "technical data" as "[i]nformation . . . which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles." 22 C.F.R. § 120.10(a)(1). This definition excludes any information in the "public domain," which is defined as follows:

> Public domain means information which is published and which is generally accessible or available to the public:
>
> (1) Through sales at newsstands and bookstores;

(2) Through subscriptions which are available without restriction to any individual who desires to obtain or purchase the published information;

(3) Through second class mailing privileges granted by the U.S. Government;

(4) At libraries open to the public or from which the public can obtain documents;

(5) Through patents available at any patent office;

(6) Through unlimited distribution at a conference, meeting, seminar, trade show or exhibition, generally accessible to the public, in the United States;

(7) Through public release (i.e., unlimited distribution) in any form (e.g., not necessarily in published form) after approval by the cognizant U.S. government department or agency (see also § 125.4(b)(13) of this subchapter);

(8) Through fundamental research in science and engineering at accredited institutions of higher learning in the U.S. where the resulting information is ordinarily published and shared broadly in the scientific community. Fundamental research is defined to mean basic and applied research in science and engineering where the resulting information is ordinarily published and shared broadly within the scientific community, as distinguished from research the results of which are restricted for proprietary reasons or specific U.S. Government access and dissemination controls. University research will not be considered fundamental research if:

(i) The University or its researchers accept other restrictions on publication of scientific and technical information resulting from the project or activity, or

(ii) The research is funded by the U.S. Government and specific access and dissemination controls protecting information resulting from the research are applicable.

*Id.* at § 120.10(a)(5); *Id.* at § 120.11(a).

The AECA provides that the State Department's designation of items as defense articles "shall not be subject to judicial review." 22 U.S.C. § 2778(h). After an item is designated on the USML, the AECA and ITAR require any person wishing to export that item to apply for a license. 22 C.F.R. § 120.4 (requiring that license "[r]equests shall identify the article or service, and include a history of this product's design, development, and use"). The denial of a license may be appealed administratively. 22 C.F.R. § 120.4(e)-(g). Thus, the elements of an export control violation under 22 U.S.C. § 2778 are as follows: the (1) willful (2) export or attempted export (3) of articles listed on the USML (4) without a license. *Kuhali v. Reno*, 266 F.3d 93, 104 (2d Cir. 2001).

## FACTUAL AND PROCEDURAL BACKGROUND

Mak was a senior engineer for Power Paragon, Inc. (Paragon), a defense contractor in Anaheim, California, that designs and manufactures electrical systems for U.S. Navy combat ships and submarines. On October 28, 2005, Tai Mak, Mak's brother, and his sister-in-law, Fuk Li, were arrested at the Los Angeles International Airport prior to boarding a flight to Hong Kong. When they were arrested, the Government seized a CD from their luggage. In addition to several innocuous files, the CD contained three encrypted files Mak had given to his brother containing export-controlled naval technology, including documents authored by Mak regarding the Quiet Electric Drive project (QED document), a project intended to decrease the signature noise data emitted by U.S. Navy submarines and warships—a submarine's greatest vulnerability. The Government also discovered a second docu-

ment authored by Mak, discussing solid-state power switches (Solid State document).

Both the QED document and the Solid State document pertained to technology used on U.S. Navy ships and submarines. These documents fall under Category VI(g) of the USML, which covers "[t]echnical data (as defined in § 120.10) . . . directly related to the defense articles enumerated in paragraphs (a) though (f) of this category." 22 C.F.R. § 121.1(VI)(g). Paragraph (a) of Category VI lists "[w]arships, amphibious warfare vessels, landing craft, mine warfare vessels, patrol vessels and any vessels specifically designed or modified for military purposes." 22 C.F.R. § 121.1(VI)(a).

Shortly after the arrests of Tai Mak and Fuk Li, the Government arrested Mak and his wife, Rebecca Chiu. Following Mak's arrest, the police conducted a search of his home, where they discovered numerous other documents containing protected military technology. Mak was indicted and ultimately charged with five counts: one count of conspiracy to violate the AECA, two counts of attempting to violate the AECA (for the QED document and the Solid State document, respectively), one count of operating as an agent of a foreign government in the United States, and one count of lying to a federal agent.

Mak's trial commenced on March 27, 2007. Prior to the trial, the Government filed a motion in limine seeking to preclude Mak from challenging the Secretary of State's determination that the charged documents constituted "technical data" on the ground that 22 U.S.C. § 2278(h) expressly prohibits judicial review. In response, Mak conceded that the DDTC's determination was not reviewable. He argued, instead, that the status of the documents as technical data, and whether they fall within the public domain exception, was also critical to the issue of his willfulness—that is, whether he knowingly or intentionally violated a known legal duty not to

export the documents. The trial court did not rule on the Government's motion, but both parties proceeded to trial based on the distinction between the Secretary's determination and Mak's subjective belief regarding the status of the documents.

At the close of trial, the jury was instructed as follows in the Court's Instruction 15:

> All technical data is subject to export control. Technical data is information required for the design, development, production, manufacture, assembly, operation, testing, or modification of defense articles. Technical data does not include information in the public domain.

> You are instructed that the information in the Solid State document and the Q.E.D. document is required for the design, development, production, manufacture, assembly, operation, testing, or modification of defense articles. You must accept this fact as true, regardless of whether you heard any witness testify to the contrary.

The Court's Instruction 16 reads as follows: "[t]he government bears the burden of proving beyond a reasonable doubt that the information contained in the Q.E.D. document and the Solid State document was not in the public domain."

Regarding count two for the Solid State document, the Court's Instruction 19 directed:

> As mentioned, the Solid-State Document is information necessary for the design, development, production, manufacture, assembly, operation, testing or modification of defense articles. However, the Solid-State Document is not "technical data" if all the information contained in the document was in the public domain. The government must prove beyond

a reasonable doubt that information in the Solid-State Document was not in the public domain.

The Court's Instruction 22 regarding the QED document was the same as its Instruction 19, except that it substituted the words "QED Document" for "Solid-State Document."

The Court's Instruction 18 and Instruction 21 listed the elements of Count 2 (attempted export of the QED Document) and Count 3 (attempted export of the Solid State Document), including the following:

> In order for the defendant to be found guilty of this charge, the government must prove each of following elements beyond a reasonable doubt.
>
> First, information contained in the [charged document] is technical data.
>
> Second, the defendant intended to willfully export from the United States the [charged document] without obtaining a license from the Department of State to export the [charged document].

The Court's Instructions 20 and 23 addressed the specific intent required for a defendant to violate the AECA. They explained that the Government had the burden to prove beyond a reasonable doubt that Mak acted willfully and that "[a]n act is done willfully if done voluntarily and intentionally with the purpose of violating a known legal duty." Instructions 20 and 23 clarified that the Government was not required to prove that "the defendant had read, was aware of, or had consulted the specific regulations governing his activities," and that in "making a determination of whether the defendant had the requisite intent, [the jury] should consider the totality of all relevant circumstances." Mak objected to the district court's proposed Instructions 20 and 23 and counsel engaged in a long discussion with the court regarding those

instructions. Mak did not proffer proposed alternative language, despite the court's invitation to do so. Before the jury was instructed, the court dismissed count four. On May 7, 2007, the jury found Mak guilty on all of the remaining counts. On March 24, 2008, Mak was sentenced to 293 months in custody, to be followed by three years of supervised release.

After the trial, Mak moved for a new trial on two grounds: (1) the Government's untimely disclosure of an expert witness violated the disclosure requirements of Federal Rule of Criminal Procedure 16; and (2) the portion of the AECA under which he was convicted was unconstitutionally vague. On January 7, 2008, the district court denied Mak's motion. Mak timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291.

We review the constitutionality of a statute as a matter of law de novo. *United States v. Sutcliffe*, 505 F.3d 944, 953 (9th Cir. 2007). We review the construction or interpretation of a statute de novo. *United States v. Norbury*, 492 F.3d 1012, 1014 (9th Cir. 2007). However, constitutional issues not originally raised at trial are reviewed for plain error. *United States v. Santiago*, 46 F.3d 885, 890 (9th Cir. 1995). Plain error review involves four prongs: (1) there must be an error, (2) "the legal error must be clear or obvious, rather than subject to reasonable dispute," (3) the error "must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings," and (4) if the first three prongs are satisfied, we have the discretion to remedy the error only if it "seriously affects the fairness, integrity or public reputation of the judicial proceedings." *Puckett v. United States*, 556 U.S. 129, 135 (2009) (internal quotation marks omitted).

We review de novo whether the district court's jury instructions misstated or omitted an element of the charged offense and review the district court's formulation of jury instructions for abuse of discretion. *United States v. Hofus*, 598 F.3d 1171, 1174 (9th Cir. 2010), *cert. denied*, 131 S. Ct. 364 (2010). We review de novo whether the jury instructions adequately cover the defense's theory of the case. *United States v. Romm*, 455 F.3d 990, 1002 (9th Cir. 2006). Federal Rule of Criminal Procedure 30(d) requires a defendant to "inform the court of the specific objection and the grounds for the objection" before the jury retires to deliberate. Fed. R. Crim. P. 30(d). Where a defendant fails to object to the court's instruction, review is for plain error. *Hofus*, 598 F.3d at 1175.

Ex post facto challenges are reviewed de novo. *United States v. Canon*, 66 F.3d 1073, 1077 (9th Cir. 1995). However, an ex post facto claim raised for the first time on appeal is reviewed for plain error. *United States v. Baker*, 10 F.3d 1374, 1394 (9th Cir. 1993), *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000).

## DISCUSSION

### I.  First Amendment

**[1]** Before weighing the merits of Mak's First Amendment claims, we must first address the standard of review for those claims. Nowhere in Mak's motion for a new trial, nor in his supporting memorandum, does he cite the First Amendment. He challenged only the broader constitutional issue of vagueness before the district court. Accordingly, while the Government had some notice of Mak's constitutional "vagueness" claims, his First Amendment claims are raised for the first time on appeal. Thus, we review Mak's First Amendment claims for plain error. *Santiago*, 46 F.3d at 890.

"(G)eneral regulatory statutes, not intended to control the content of speech but incidentally limiting its unfettered exer-

cise, have not been regarded as the type of law the First or Fourteenth Amendment forbade Congress or the States to pass, when they have been found justified by subordinating valid governmental interests, a prerequisite to constitutionality which has necessarily involved a weighing of the governmental interest involved." *Konigsberg v. State Bar*, 366 U.S. 36, 50-51 (1961). To determine whether a restriction is content-based, we must determine "whether the government has adopted a regulation of speech 'without reference to the content of the regulated speech.' " *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 (1994) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). "The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of the message it conveys." *Ward*, 491 U.S. at 791.

If the Government restricts the dissemination of writing based on content, then the Government's regulation is subject to strict scrutiny. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,* 487 U.S. 781, 790 (1988). A restriction that is not content-based and only incidentally restricts expressive activity is subject to intermediate scrutiny. *United States v. O'Brien*, 391 U.S. 367 (1968). "A content-neutral regulation will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997).

**[2]** Here, the AECA prohibits export without a license of items on the USML without regard to content or viewpoint; it was intended to authorize the President to control the import and export of defense articles and defense services in "furtherance of world peace and the security and foreign policy of the United States." 22 U.S.C. § 2778(a)(1). Mak's arguments that the AECA and its implementing regulations are content-based mistakenly focus on the nature of the content incidentally restricted, and not the nature of the statute. *Cf. Konigs-*

*berg*, 366 U.S. at 50-51. The purpose of the AECA does not rest upon disagreement with the message conveyed. *See generally Cohen v. California*, 403 U.S. 15, 18-19 (1971). ITAR defines the technical data based on its *function* and not its viewpoint. *See* 22 C.F.R § 120.10(a)(1) (defining technical data as information "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance or modification of defense articles"). Accordingly, we find that the AECA and its implementing regulations are content-neutral.

**[3]** Because the AECA and its implementing regulations are content-neutral, we apply the intermediate scrutiny standard under *O'Brien*. 391 U.S. 367 (1968). The AECA and its implementing regulations satisfy *O'Brien* because, together, they substantially advance important governmental interests unrelated to the suppression of expression. 391 U.S. at 376-77*; see also Haig v. Agee*, 453 U.S. 280, 307 (1981). We have long-recognized the "unquestionable legitimacy" of the Government's important interest in regulating the international dissemination of military information. *United States v. Edler Indus., Inc.*, 579 F.2d 516, 520, 522 (9th Cir. 1978); *see also United States v. Posey,* 864 F.2d 1487, 1496 (9th Cir. 1989). The technical data regulations substantially advance that interest, unrelated to the suppression of expression, because they set forth clear procedures for seeking approval for export licenses and policies for limiting USML-designation. *See* 22 C.F.R § 120.10(a)(1), (3) (the determination of designation of articles or services turns on whether an item is "specifically designed, developed, configured, adapted, or modified for a military application, and has significant military or intelligence applicability such that control under this subchapter is necessary"). Moreover, the restrictions do not burden speech more than is necessary to further the Government's interest. Indeed, ITAR makes a point to specifically exclude numerous categories from designation, such as general scientific, mathematical, or engineering papers. *See Holder v. Humanitarian Law Project*, 130 S. Ct.

2705, 2728-29 (2010) (upholding material support statute against First Amendment challenge where the statute provided narrowing definitions to avoid infringing upon First Amendment interests). Accordingly, guided by *O'Brien*, we hold that the AECA and its implementing regulations withstand intermediate scrutiny because they substantially advance the Government's important interest in the regulation of international dissemination of arms information. 391 U.S. at 376-77.

We note that we have repeatedly upheld the constitutionality of the AECA, and its predecessor, the Mutual Security Act (MSA), under the First Amendment. *See United States v. Posey,* 864 F.2d 1487 (9th Cir. 1989)*; United States v. Edler Indus., Inc.*, 579 F.2d 516, 520 (9th Cir. 1978). In *Edler*, we held,

> [T]he federal government undeniably possesses the power to regulate the international arms traffic . . . As a necessary incident to the power to control arms export, the President is empowered to control the flow of information concerning the production and use of arms. The authority to regulate arms traffic would be of negligible practical value if it encompassed only the exportation of particular military equipment but not the exportation of blueprints specifying the construction of the very same equipment.

*Edler,* 579 F.2d at 520. We upheld the MSA because it was substantially related to the Government's strong interest in controlling "the conduct of assisting foreign enterprises to obtain military equipment and related technical expertise." *Id.* at 520-21. In *Posey*, we rejected a First Amendment challenge to the AECA on the grounds that "national security concerns may be more sharply implicated by the export abroad of military data than by domestic disclosure of such data." 864 F.2d at 1496-97. We held that the Government could restrict the flow of data on the USML, through the AECA, because of its

strong, legitimate interest in regulating the export of military information. *Id.*; *see also Edler*, 579 F.2d at 520.

Mak contends that the AECA and its implementing regulations violate the First Amendment both as a prior restraint and for being unconstitutionally overbroad. We disagree. We have repeatedly rejected First Amendment challenges to the AECA, its implementing regulations, and its predecessor, the MSA; *Edler,* 579 F.2d at 520, and *Posey,* 864 F.2d at 1496, control. As *Edler* required, the AECA "delineate[s] narrowly the scope of information subject to arms controls." 579 F.2d at 521. The AECA and ITAR specifically carve out exceptions to the law for the types of information that are subject to the highest levels of First Amendment protection, for example, published scholarly works. 22 C.F.R. § 120.11(a). The AECA also satisfies *Edler*'s requirement that the defendant "know or have reason to know that [the exported] information is intended for the prohibited use" by requiring the government to prove willfulness. *See Edler*, 579 F.2d at 521; 22 U.S.C. § 2778(c). Accordingly, we hold that under *Edler* and *Posey,* the AECA and its implementing regulations satisfy the requirements of First Amendment scrutiny. *Posey*, 864 F.2d at 1496; *Edler*, 579 F.2d at 520

## II.   Technical Data Jury Instructions

**[4]** Mak next challenges the jury instructions on "technical data" on the ground that they relieved the Government of its burden of proving that the documents did not fall within the public domain. The Court's Instructions 15, 16, 19 and 22 pertain to technical data and the public domain. Because Mak objected to the jury instructions on the public domain at trial, we review his challenge de novo. *Hofus*, 598 F.3d at 1174.

The Court's Instruction 15 told the jury that "all technical data is subject to export control" and that "[t]echnical data is information required for the design, development, production, manufacture, assembly, operation, testing, or modification of

defense articles." The Court's Instructions 15, 19, and 22 emphasized to the jury that "technical data" does not include information in the public domain. The district court's instructions made clear that the definition of technical data has two parts: it is information which is (1) "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance, or modification of defense articles;" that (2) does not fall in the public domain. 22 C.F.R. § 120.10(a)(1); 120.10(a)(5). From the court's instructions, it was clear that information in the public domain cannot constitute "technical data."

**[5]** Mak contends that the district court's instructions on technical data constituted reversible error because the court's instructions removed from the jury's consideration whether the QED and Solid State documents were in the public domain. Specifically, Mak contends that because the Court's Instructions 19 and 22 told the jury that the QED and Solid State documents were information which was "required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance, or modification of defense articles," the instructions relieved the Government of its burden to prove the documents were not in the public domain. We disagree with Mak's circuitous logic. The technical data instructions clearly identified the two elements of technical data, and then broke down the Government's relative burdens concerning each element. The first element was inclusive*,* describing the different types of information that could qualify as technical data—"Information which is required for the design, development, production, manufacture, assembly, operation, repair, testing, maintenance, or modification of defense articles." The second element was exclusive, disqualifying from the designation as technical data any information that fell within the public domain. Because the district court specifically instructed the jury that any information in the public domain cannot be "technical data," we find that the district court did not err in its jury instructions concerning technical data.

### III.   Jury Instructions and Deliberations on Willfulness

Every criminal defendant has a constitutional right to a "meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984); *see also United States v. Stever,* 603 F.3d 747, 755 (9th Cir. 2010) (grounding right to a meaningful defense in the Fifth and Sixth Amendments). An accused can defend against a charge that requires the Government to prove willfulness by presenting evidence that he did not voluntarily or intentionally violate a known legal duty. *Cheek v. United States,* 498 U.S. 192, 202-03 (1991).

**[6]** Mak contends that the district court deprived him of full jury deliberations on willfulness on the following three grounds: (1) the district court's refusal to accept his proposed jury instruction deprived him of his Sixth Amendment right to present a complete defense; (2) the district court's willfulness instruction deprived Mak of a jury determination as to whether he voluntarily or intentionally violated a known legal duty when he attempted to send the QED and Solid State documents to China; and (3) the district court erred in its failure to instruct the jury on the basic marketing information and general system descriptions exceptions to technical data. We disagree, and we address each of Mak's arguments in turn.

We review for plain error Mak's claim that the court's instructions deprived him of his Sixth Amendment right to a meaningful defense.[1] *Santiago*, 46 F.3d at 890. Specifically,

---

[1]In the district court, Mak objected to the Court's Instruction No. 23 only on the ground that it was argumentative. Mak did not object to the instruction on the ground that it limited the jury's consideration of evidence suggesting that Mak did not believe the documents were technical data. Nor did Mak object to the instruction on Sixth Amendment grounds. Mak's single "argumentative" objection was insufficient to put the court on notice of his defense theory challenge or his constitutional challenge. Indeed, after the final instruction was presented to Mak, he was even

Mak contends that the district court erred when it rejected the following proposed jury instruction:

> Information which is in the public domain does not constitute technical data and therefore is not subject to the export controls of the United States Munitions List. Even if you determine that any of the items at issue in Counts two, three or four were not in the Public Domain, you the jury must consider whether Mr. Chi Mak believed the items were in the Public Domain in order to determine whether he willfully and knowingly exported defense articles.

Although the court must instruct on a defense theory if it has a basis in law and fact, "it is not reversible error to reject a defendant's proposed instruction on his theory of the case if other instructions, in their entirety, adequately cover that defense theory." *United States v. Mason*, 902 F.2d 1434, 1438 (9th Cir. 1990).

We find that the district court adequately instructed the jury on Mak's defense theory regarding specific intent. Specifically, in the Court's Instructions 20 and 23, the court informed the jury that the Government had the burden to prove that Mak had acted "willfully" "with the purpose of violating a known legal duty" in attempting to export the QED and Solid State documents. In the same instructions, the district court emphasized, however, that the Government was not required to prove that "the defendant had read, was aware of, or had consulted the specific regulations governing his activities," but rather, in its determination of intent, the jury

---

invited by the court to further supplement the instruction if he believed the jury would need further direction on the definition of "violating a known legal duty"—Mak failed to offer any supplemental instruction despite the court's invitation. Accordingly, we review his claim on appeal for plain error. *Hofus*, 598 F.3d at 1175; *see also United States v. Pineda-Doval*, 614 F.3d 1019, 1025 (9th Cir. 2010).

must consider "the totality of the circumstances." Both instructions directed the jury to deliberate on whether Mak possessed the specific intent to violate the AECA. Because Mak's theory of the case was already reflected in the entirety of the court's other instructions, the court was not obligated to accept Mak's proposed instruction. *Mason*, 902 F.2d at 1438. Accordingly, we hold that the court's instruction did not prevent Mak from providing a meaningful defense.

Mak did not raise his claim that the jury instructions removed the issue of willfulness from the jury's consideration at trial; therefore we also review this challenge for plain error. *Hofus,* 598 F.3d at 1175. Mak contends that the court violated his right to a jury determination of his willfulness. We disagree. Mak ignores the fact that the district court permitted him to present defense witnesses (including experts and Mak's co-authors) who contended that the QED and Solid State documents were not technical data, and to argue that the evidence showed that the defendant did not believe the documents required an export license.

**[7]** Mak also argues that the language of the court's instructions permitted the Government to make an improper argument and did not allow him to effectively respond to that argument. In closing argument, the prosecutor said: "[Mak's witnesses] tried hard to say that what we're dealing with here, in the QED document, is not technical data. You just heard from the court that whatever those witnesses said, this is technical data." Considered out of context, this appears to be an objectionable and inaccurate characterization of the jury instructions, which told the jurors that they had to accept that the QED and Solid State documents contained information "required for the design, development, production, manufacture, assembly, operation, testing, or modification of defense articles." As we have noted, the court's instructions did not conclusively state that the information in the QED and Solid State documents was "technical data." However, the thrust of the Government's argument, in which that objectionable state-

ment was made, concerned the credibility of Mak's witnesses who testified that they believed the information in the QED document was either in the public domain or not related to submarines. Specifically, the Government focused on Mak's failure to address the fact that the information in the QED document was not disclosed in the most relevant patent—the most likely way in which it would have fallen within the public domain. The Government then explained that the QED document plainly described, and sometimes even illustrated, the submarine technology that served as the focus of the QED project—clearly falling under Paragraph (a) of Category (VI) of the USML. 22 C.F.R. § 121.1(VI)(a). These arguments related to the Government's claim that Mak must have known that the QED document pertained to submarine technology because just four days before he attempted to send the QED document to China he had emailed another Paragon employee about a submarine-related question for the QED project. The Government thus argued that the jury should infer that Mak knew the QED document was "technical data" because he knew it related to the development of submarine technology. The jury instructions on public domain and willfulness left Mak free to argue that the evidence, including the testimony of the witnesses he presented, did not support this inference. The instructions did not remove the issue of Mak's willfulness from the jury's consideration, nor did they violate his Sixth Amendment right to present a meaningful defense.

[8] Even if Mak's right to present a meaningful defense was compromised, he cannot show the requisite prejudice because there was overwhelming evidence that he knew his actions were illegal. *See United States v. Olano*, 507 U.S. 725, 741 (1993) (defendant bears burden of showing that violation would have affected the outcome of the proceedings under third prong of plain error review). Indeed, there was ample evidence of Mak's extensive export compliance training and knowledge, as well as evidence that he knew exactly what was contained in the QED and Solid State documents. Accordingly, we hold that the court did not plainly err in its

instructions concerning willfulness, nor did it deprive Mak of his Sixth Amendment right to present a meaningful defense.

Finally, Mak challenges the district court's failure to instruct the jury on the general systems descriptions and basic marketing information exceptions to technical data, under the Sixth Amendment. This constitutional challenge was not raised at the district court, nor did Mak proffer as a defense at trial that the information in the charged documents was generally-taught scientific information or basic marketing information. Accordingly, we review his challenge for plain error. *Santiago*, 46 F.3d at 890.

Mak never proffered as a defense that the information in the charged documents was generally-taught scientific information or basic marketing information; therefore, the district court was under no obligation to include the exceptions in its instructions. *United States v. Freter*, 31 F.3d 783, 788 (9th Cir. 1994). Moreover, the jury's rejection of Mak's public domain argument demonstrates that the omission of the aforementioned exceptions from the technical data instructions could not have affected the outcome of the proceedings as required under plain error review. Ultimately, Mak can neither show that the omission of this jury instruction clearly and obviously deprived him of a defense, nor that it prejudiced his substantial rights. *Olano*, 507 U.S. at 741. We hold that the district court did not plainly err because the three exceptions not included by the court are not elements of the offense, and therefore are not requisite components of the jury instructions.

## IV.  Ex Post Facto Clause

Article I, Section 9, paragraph 3 of the United States Constitution provides that "[n]o . . . ex post facto [l]aw shall be enacted." A law violates the Ex Post Facto Clause "only if it criminalizes conduct that was not a crime when it was committed, increases the punishment for a crime beyond what it was at the time the act was committed, or deprives a person

of a defense available at the time the act was committed." *Rise v. Oregon*, 59 F.3d 1556, 1562 (9th Cir. 1995).

**[9]** Mak raises his Ex Post Facto Clause claim for the first time on appeal, so we review it for plain error. *Baker,* 10 F.3d at 1394. Mak argues that his prosecution and imprisonment violated the Ex Post Facto Clause because the Solid State and QED documents were *certified* as "technical data" on the USML between eight and eleven months, respectively, after he was arrested. Mak argues the documents only became criminally sanctionable because of the technical data certification secured by the Government *after* he was arrested, and therefore his prosecution violated the Ex Post Facto Clause.

**[10]** Mak's argument is unpersuasive because he assumes that technical data is not included on the USML until it is certified. This is incorrect. The USML consists of a wide array of categories of defense articles and technology that are not certified in subcategories, nor need they be. The USML does not list particular documents because so many qualifying documents exist. Indeed, it would likely be impossible for the USML to be continuously updated with every new technology and every permutation of existing technology. The Government's certification in this case served only to confirm that the documents were covered by the USML at the time of the offense. The QED and Solid State documents were clearly covered by the USML at the time of Mak's arrest and conviction because they directly related to "[w]arships, amphibious warfare vessels, landing craft, mine warfare vessels, patrol vessels and any vessels specifically designed or modified for military purposes." 22 C.F.R. § 121.1(VI)(a). Accordingly, because the documents fell within a category included by the USML at the time of the offense, his prosecution and conviction does not violate the Ex Post Facto Clause.

## CONCLUSION

For the foregoing reasons, we AFFIRM Mak's conviction.