**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee*,

v.

NOSHIR S. GOWADIA,
    *Defendant-Appellant*.

No. 11-10058

D.C. No.
1:05-cr-00486-
SOM-KSC-1

OPINION

Appeal from the United States District Court
for the District of Hawai'i
Susan Oki Mollway, Chief District Judge, Presiding

Argued and Submitted
February 18, 2014—Honolulu, Hawai'i

Filed July 28, 2014

Before: Michael Daly Hawkins, M. Margaret McKeown,
and Carlos T. Bea, Circuit Judges.

Opinion by Judge McKeown

# SUMMARY[*]

## Criminal Law

The panel affirmed a conviction for violations of the Arms Export Control Act of 1976, the Espionage Act of 1917, and related provisions on charges that the defendant unlawfully exported defense services and technical data related to the design of the B-2 stealth bomber and other classified government projects to the People's Republic of China, and that he disclosed related classified information to persons in Switzerland, Israel, and Germany.

The defendant argued that evidence obtained during his interrogations should have been suppressed because of an unnecessary or unreasonable delay in presentment to a magistrate judge. The panel rejected the defendant's contention that the words "arrest or other detention" in 18 U.S.C. § 3501(c) expand the right to prompt presentment beyond the contours of Fed. R. Crim. P. 5(a), meaning that the right to presentment may attach even absent formal arrest. Assuming without deciding that "other detention" and formal "arrest" in § 3501(c) have different meanings, the panel held that the defendant cannot invoke the *McNabb-Mallory* rule – which generally renders inadmissible confessions made during periods of detention that violate the prompt presentment requirement of Fed. R. Crim. P. 5(a) – because he was not, during the period in question, either formally arrested or in "other detention" within the meaning of § 3501.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that there was no error in the district court's jury instructions on the government's burden with respect to information in the public domain and basic marketing information.

## COUNSEL

Georgia K. McMillen (argued), Wailuku, Hawai'i, and Harlan Y. Kimura, Honolulu, Hawai'i, for Defendant-Appellant.

Stephan E. Oestreicher, Jr. (argued), Attorney, Appellate Section, Criminal Division, United States Department of Justice, Washington, D.C.; Florence T. Nakakuni, United States Attorney, Kenneth M. Sorenson, Assistant United States Attorney, District of Hawai'i, Honolulu, Hawai'i; Mythili Raman, Acting Assistant Attorney General, Denis J. McInerney, Acting Deputy Assistant Attorney General, Criminal Division; John P. Carlin, Acting Assistant Attorney General, Virginia M. Vander Jagt, Robert E. Wallace, Jr., Attorneys, National Security Division, United States Department of Justice, Washington, D.C., for Plaintiff-Appellee United States.

**OPINION**

McKEOWN, Circuit Judge:[1]

Noshir Gowadia appeals his conviction for violations of the Arms Export Control Act of 1976 ["AECA"], the Espionage Act of 1917, and related provisions on charges that he unlawfully exported defense services and technical data related to the design of the B-2 stealth bomber and other classified government projects to the People's Republic of China, and that he disclosed related classified information to persons in Switzerland, Israel, and Germany. *See* 22 U.S.C. § 2778; 18 U.S.C. §§ 793(e), 794(a).

At issue is Gowadia's claim that his right to prompt presentment before a magistrate judge was triggered before he was actually arrested, and that the inculpatory statements he made to federal agents investigating his activities should have been suppressed. Gowadia also challenges the jury instructions as unconstitutional on the ground that the government was wrongly relieved of its burden to prove that the information Gowadia exported was not in the public domain and was not "basic marketing information" exempted from the definition of "technical data" under the AECA.[2]

---

[1] This opinion is based on the publicly-filed documents and excerpts of record and does not incorporate or reference any classified material.

[2] Gowadia does not appeal his convictions on the money laundering and tax fraud counts, 18 U.S.C. § 1957 or 26 U.S.C. § 7206(1).

In a letter filed with the court before oral argument, Gowadia withdrew his challenge to the district court's determination that he was "not allowed to challenge the classification decisions of the executive branch."

Because these arguments fail as a matter of law, we affirm Gowadia's conviction.

## BACKGROUND

Gowadia is a naturalized American citizen who worked for nearly twenty years as an engineer at the Northrop Corporation on the design of the B-2 stealth bomber and other highly classified projects. The B-2 became the United States's "premier strategic bomber," in part because it was designed to be "low-observable." Gowadia was a lead engineer of a system designed to enable the B-2 to avoid detection by suppressing the infrared signature emanating from the aircraft. The United States maintains a "significant operational lead" in the manipulation of aircraft signatures. Because of its strategic importance, information relating to this system and other stealth technologies is especially tightly controlled.

Shortly after leaving Northrop, Gowadia started a business, N.S. Gowadia, Inc. ("NSGI"), to provide consulting services to the aerospace engineering industry. At NSGI, Gowadia developed and marketed a system called AIRSS (Advanced Infrared Suppression System), which, like the systems he designed at Northrop, was intended to reduce the infrared signature of aircraft.

Through NSGI, Gowadia sent a series of letters and emails to three foreign individuals revealing information that he later admitted was classified. In October 2002, for example, Gowadia sent a letter to an official at the Swiss Ministry of Defense detailing Gowadia's success in suppressing the infrared signature of the B-2 and offering his services to help reduce the signature of Swiss military

helicopters. He sent similar communications to individuals
working for defense contractors in Germany and Israel. None
of the individuals Gowadia contacted was authorized to
receive classified information.

Around the same time, Gowadia began a working
relationship with the Chinese government. Gowadia
exchanged a series of emails with a Chinese operative, and
agreed to brief Chinese officials on aircraft "propulsion" and
"survivability" and to design, for a fee, certain aircraft parts.
Between 2003 and 2005, Gowadia made six trips to China,
paid for by the Chinese government, often entering and
exiting China without a visa or stamp in his passport and
communicating while there via pseudonymous email
accounts.

Among other things, Gowadia gave Chinese officials a
presentation and a computer file that analyzed how a Chinese
cruise missile, if modified with Gowadia's designs, would
perform against a United States AIM-9 class missile. The
Chinese government paid Gowadia more than $100,000 for
his work. Gowadia would later admit that he "shared military
secrets . . . [and] technical knowledge" with China that he
"had acquired over many years working with US systems[]
like [the] B-2," and would surmise that his activities
amounted to "espionage and treason."

The United States government began to suspect Gowadia
of unlawful activities, and secured a search warrant for
Gowadia's house. Federal agents arrived at Gowadia's house
in Maui on October 13, 2005, executed the search warrant,
and asked Gowadia whether there was a private place where
they could talk. After adjourning to the crafts room, they
reviewed an Advice of Rights form with Gowadia, informing

him of his rights, among others, to seek the advice of counsel and to terminate the interview at any time, and advised him on more than one occasion that he was not under arrest and was free to leave. Gowadia signed the form, and the agents then interviewed him for roughly six hours. The agents completed their search late that evening and seized computers, papers, his passport, foreign currency, and other materials. Before departing, the agents and Gowadia agreed to meet the following day.

The group met at a coffee shop the next day but, because it was impossible to discuss classified information there, the agents asked Gowadia if there was another location where they could talk. Gowadia did not suggest an alternative site, and the agents proposed continuing their conversation at the Maui County Police Department. Gowadia agreed to accompany them in his own vehicle. After Gowadia signed another Advice of Rights form, he and the agents spoke for about six and a half hours. During this session, Gowadia stated that he had retained classified material and used it for business purposes[3] and that he had disclosed classified information to foreign individuals and governments, including China. In a pattern that would continue throughout the following several days of interrogation, Gowadia "volunteered to write down" detailed handwritten statements describing his activities. Gowadia agreed to continue the conversation at another time and returned home.

---

[3] Among the classified documents seized from Gowadia were classified charts on signature suppression, an altered document from which he had cut the word "secret," and other documents that he had "cut up and modified" to conceal their source.

The next day, October 15, 2005, Agent Mohajerin contacted Gowadia and requested that he "consider flying to Honolulu for further discussions" with federal agents at the government's expense. Gowadia agreed to do so and arrived in Honolulu on October 16. The agents interviewed Gowadia in seven sessions between Monday, October 17, and Monday, October 24, at the FBI office in Honolulu. Gowadia signed an Advice of Rights form before each interrogation session. The seven Honolulu sessions lasted between 6.5 and 7.5 hours each day. During these sessions, Gowadia wrote out copious notes—the record contains seventy-odd pages of them—for the agents, detailing his activities and his motivations, and admitting wrongdoing. Gowadia also acknowledged on each occasion that he was free to leave.

On Wednesday morning, October 26, Gowadia arrived by taxi at the Honolulu Federal Building. Federal agents met him there and escorted him to the FBI office, where he was arrested pursuant to a warrant obtained earlier in the day. Gowadia was assigned an attorney from the Federal Public Defender's office and appeared before a magistrate judge later that day.

Following a 41-day jury trial, Gowadia was convicted on fourteen counts related to charges that, in the course of conducting his business activities at NSGI, he disclosed protected national security information to foreign governments and individuals. Specifically, Gowadia was convicted of (a) conspiring to violate, and violating, the AECA and its implementing regulations[4] by exporting defense services and technical data to China without a license

---

[4] The International Traffic in Arms Regulations, 22 C.F.R. §§ 120 *et seq.*, and the United States Munitions List, 22 C.F.R. §§ 121.1 *et seq.*

(Counts 1 and 2); (b) violating the Espionage Act, 18 U.S.C. §§ 793(e) and 794(a), and aiding and abetting violations of that Act, by giving the Chinese a presentation and a computer file that, among others, predicted how well China's cruise missile would perform against a counter-attacking American missile when fitted with the infrared signature-reducing exhaust nozzle Gowadia had designed (Counts 6 and 8); (c) violating the Espionage Act and aiding and abetting violations of that Act by sending classified infrared-reduction information about the B-2 bomber to persons not authorized to receive it in Switzerland, Israel, and Germany (Counts 9–11); (d) violating the AECA and its implementing regulations and aiding and abetting AECA violations by wilfully exporting defense services and technical data to these three countries without a license (Counts 12–14); (e) retaining classified documents without authorization (Count 15); (f) laundering money (Count 19); and (g) filing false tax returns (Counts 20–21). Gowadia was sentenced to thirty-two years' imprisonment.

## ANALYSIS

### I. PRESENTMENT: FEDERAL RULE OF CRIMINAL PROCEDURE 5(a)

We first consider whether evidence obtained during Gowadia's repeated interrogations should have been suppressed because of an unnecessary or unreasonable delay in presentment.[5]

---

[5] We note that Gowadia seeks only to suppress his statements as a consequence of a claimed delay in presentment and does not contend either that they were made involuntarily or that they should be suppressed under *Miranda v. Arizona*, 384 U.S. 436 (1966).

The right to prompt presentment, in its contemporary form, is found in Federal Rule of Criminal Procedure 5(a), which provides that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge." FED. R. CRIM. P. 5(a)(1)(A). Where the right to prompt presentment has been violated, two sources—18 U.S.C. § 3501(c) and what we have termed the *McNabb-Mallory* rule—govern the admissibility of any resulting confessions. *See Corley v. United States*, 556 U.S. 303, 322 (2009).

Some history is helpful as context for the relationship between the right to presentment and the remedy of suppression. *See id.* at 306–10. At common law, the presentment requirement "tended to prevent secret detention and served to inform a suspect of the charges against him." *Id.* at 306. In *McNabb v. United States*, 318 U.S. 332 (1943), the suspects were arrested and then interrogated for several hours before being brought before a magistrate. *Id.* at 334–42. The Court held that "confessions [are] inadmissible when obtained during unreasonable presentment delay." *Corley*, 556 U.S. at 307 (explaining the holding of *McNabb*). Rule 5(a) was adopted following *McNabb*, "pull[ing] the several statutory presentment provisions together in one place." *Id.* In *Mallory v. United States*, 354 U.S. 449 (1957), the Court applied Rule 5(a) and held that a confession given seven hours after an arrest was inadmissible for "extended delay." *Id.* at 455. "Thus," as the Court explained in *Corley*, "the rule known simply as *McNabb-Mallory* 'generally render[s] inadmissible confessions made during periods of detention that violat[e] the prompt presentment requirement of Rule 5(a).'" 556 U.S. at 309 (quoting *United States v. Alvarez-Sanchez*, 511 U.S. 350, 354 (1994)) (alterations in original).

In part to address concerns with the broad application of *McNabb-Mallory*, Congress enacted 18 U.S.C. § 3501(c), which establishes a six-hour safe harbor for voluntary confessions.[6] Section 3501(c) provides that:

> . . . a confession made or given by a [defendant] . . . while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge or other officer . . . if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention. . . .

18 U.S.C. § 3501(c).

The rule as it stands today is relatively simple to apply. When a criminal defendant brings a suppression motion based on *McNabb-Mallory*, the district court looks to see whether the confession was obtained within six hours of arrest. If so, *McNabb-Mallory* does not bar its admission. (Of course, the confession could be inadmissible for other reasons.) If, however, the "confession occurred before presentment and beyond six hours, . . . the court must decide whether delaying

---

[6] "Subsections (a) and (b) of § 3501 were meant to eliminate *Miranda*." *Corley*, 556 U.S. at 309. The Court later held that Congress may not legislatively supersede *Miranda*. *Dickerson v. United States*, 530 U.S. 428, 444 (2000).

that long was unreasonable or unnecessary . . . and if it was, the confession is to be suppressed." *Corley*, 556 U.S. at 322.

As the Court explained in *Corley*, the starting point for claims under § 3501 is "whether the defendant confessed within six hours of *arrest*." *Id.* (emphasis added). In other words, "[section] 3501 modified *McNabb-Mallory* without supplanting it." *Id.* The language and analysis of the section focus on the time of arrest, a point that makes sense because Rule 5(a) applies only in situations involving formal arrest on specific charges. FED. R. CRIM. P. 5(a)(1) ("Appearance Upon an Arrest"). By its own terms, the Rule governs the conduct of "person[s] making an arrest," and dictates that those persons bring "the defendant" before a magistrate judge. FED. R. CRIM. P. 5(a)(1)(A). Rule 5(a) interacts with subsections 5(d) and 5(e), which specify that the magistrate judge must convey certain information to the "defendant": the "complaint against [him]," for instance, and the right to counsel. FED. R. CRIM. P. 5(d); 5(e) (citing Rule 58(b)(2)). Without specific pending criminal charges, the directives of Rules 5(d) and 5(e) would make no sense; the magistrate would have nothing to tell a person not yet accused or arrested. FED. R. CRIM. P. 5(d); 5(e); *see also* BLACK'S LAW DICTIONARY 482 (9th ed. 2009) (defining a "defendant" as the "accused in a criminal proceeding").

Gowadia contends that the words "arrest or other detention" in § 3501(c) expand the right to prompt presentment beyond the contours of Rule 5(a), meaning that the right to presentment may attach even absent formal arrest. Gowadia claims that the right attached in his case because he was under detention during the interrogation and so his statements are inadmissible under § 3501(c). We reject this formulation.

Section 3501(c) and *McNabb-Mallory* do not expand the *right* to presentment established by Rule 5(a), but instead provide that "the *remedial framework* for . . . violations of th[at] right" is suppression. *United States v. McDowell*, 687 F.3d 904, 910 (7th Cir. 2012). Section 3501(c) was intended to limit *McNabb-Mallory*, not to expand it. *See Corley*, 556 U.S. at 318 (noting that "[i]n its original draft, subsection (c) would indeed have done away with *McNabb-Mallory* completely"). Reading § 3501(c) to expand the presentment clause to persons not covered by Rule 5(a) would contravene this intent.

The Court's analysis in *Alvarez-Sanchez* underscores our interpretation of the interplay between Rule 5(a) and § 3501(c): the "terms of [§ 3501(c)] can apply only when there is some 'delay' in presentment," and "there can be no 'delay' in bringing a person before a federal magistrate until, at a minimum, there is some obligation to bring the person before such a judicial officer in the first place." 511 U.S. at 357–58. Looking to Rule 5(a), the Court held that the obligation to "present a person to a federal magistrate does not arise until the person has been arrested for a *federal* offense," *id.* at 358 (citing FED. R. CRIM. P. 5(a)), or "detained *for* a federal crime," *id.* (emphasis added). We read this latter mention of detention so that it is consistent with the remainder of the paragraph: the only persons required to be brought before the magistrate judge are those "charged with offenses against the laws of the United States," whether arrested or detained. 18 U.S.C. § 3501(c). The words "detained" or "detention," as they are used in § 3501, cannot be understood without this context. *Cf.* FED. R. CRIM. P. 5(d) (requiring that the magistrate judge inform a defendant charged with a felony of "the complaint against [him]"); 5(e)

(citing Rule 58(b)(2)). In short, the Court ties § 3501 to Rule 5(a).

How and why the words "other detention" found their way into § 3501(c) is a mystery not solved by reading the case law or statutory history. Where, in cases dealing with the presentment requirement, the Court has referred to both arrest and detention, it has specifically tethered its holding to Rule 5(a), which requires an arrest. *See, e.g.*, *Alvarez-Sanchez*, 511 U.S. at 358. The words "arrest" and "detention" could be, in this context, either duplicative or independent. To the extent that the words have essentially the same meaning, this superfluity is not fatal. As Justice Souter once noted, even where Congress "indulged in a little redundancy," such "inelegance may be forgiven," because "Congress could sensibly have seen some practical value in the redundancy." *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 445–46 (1995) (Souter, J., dissenting). Alternatively, Congress may have wanted to preserve the "traditional rule that a confession will be suppressed" in the "presumably rare scenario of improper collaboration or a working arrangement between local and federal law enforcement" hoping to skirt the presentment requirement by arresting a person on state, but not federal, charges, *United States v. Rowe*, 92 F.3d 928, 933 n.2 (9th Cir. 1996) (quoting *Alvarez-Sanchez*, 511 U.S. at 359) (internal quotation marks omitted), or to preserve a remedy for the extreme scenario, not present here, in which the detention is legally tantamount to an arrest, *see, e.g.*, *United States v. Robinson*, 439 F.2d 553, 563–64 (D.C. Cir. 1970) (holding that a confession should be suppressed where an institutionalized mental patient was detained for eight months, without access to counsel, because "even if not technically arrested, he was as though arrested").

We reserve judgment on whether the term "other detention" might have independent meaning from "arrest" upon formal charges in an extraordinary situation. For purposes of this appeal, we assume without deciding that the two terms have different meanings. We need not resolve this potentially far-reaching question here. Instead, we hold that Gowadia cannot invoke *McNabb-Mallory* because he was not, during the period in question, either formally arrested or in "other detention" within the meaning of § 3501. The interviews between October 13 and 25 did not amount to "detention."

Gowadia voluntarily accompanied the agents to each interview, first to the craft room, then to the coffee shop, then to the police station in Maui, and then to Honolulu.[7] He was told, at his house, that he was free to leave, and during each interview, was told that he was "free to leave," that he could "terminate" the interviews, that he was "not under arrest." No restrictions were placed on his movement, as he acknowledged, and he was never handcuffed. Gowadia *did* terminate interviews when he was tired, and at the end of each day in Honolulu he left the FBI offices and returned to his hotel room. (At one point, when he complained about the quality of his hotel, the government made arrangements to relocate him to a nicer hotel.)

Though not dispositive, it is notable that Gowadia, who was given fresh *Miranda* warnings before each session, not

---

[7] Gowadia challenges the district court's factual findings pertaining to his motion to suppress. Reviewing for clear error, *United States v. Zakharov*, 468 F.3d 1171, 1179 (9th Cir. 2006), we affirm the district court's factual findings, which are amply supported by the record developed at the suppression hearing.

only willingly but enthusiastically shared information with authorities, writing out extensive notes each day—some seventy pages in total—describing his activities in pinpoint detail. He drew diagrams for agents, relayed the contents of conversations and travels, and reflected daily about his wrongdoings. He ended his notes with assurances that they had been written voluntarily, and that he had been informed of his rights.[8] We agree with the district court that Gowadia was neither arrested nor under "other detention." Whatever "other detention" may encompass, it does not include the scenario described by these facts. Gowadia's inculpatory statements were properly admitted.

## II. JURY INSTRUCTIONS

We next address Gowadia's challenge that certain jury instructions were deficient because they relieved the government of its burden to prove that the "defense services" and "technical data" Gowadia exported were not in the public domain, and because they omitted the government's burden to prove that the technical data at issue were not basic marketing information.

Although Gowadia's counsel affirmatively agreed to the instructions, we give Gowadia the benefit of the doubt and

---

[8] He wrote, for example: "On reflection what I did was wrong . . . . I made the above statements so that I can correct the harm I have caused & move on to the next phase of my life, which is retirement. The agents have made no threats or promises about the outcome. I acknowledge that I would be held accountable. I was explained that I could call a lawyer, stop talking or leave."

review for plain error.[9] *United States v. Perez*, 116 F.3d 840, 846 (9th Cir. 1997) (distinguishing forfeiture from waiver). There was no error here, let alone plain error, because the court properly instructed the jury on the government's burden with respect to information in the public domain and "basic marketing information." Accordingly, we need not reach the other prongs of the plain error test. *See generally United States v. Olano*, 507 U.S. 725, 732 (1993).

The substantive counts under AECA were counts 2 and 12–14. As to Count 2, the instructions specified that the government was required to prove beyond a reasonable doubt that "the defense services and technical data were not in the public domain," and as to Counts 12, 13, and 14, that "the technical data was [*sic*] not in the public domain." The instructions defined "public domain" at length. The instructions specified that the AECA "includes and incorporates the International Traffic in Arms Regulations," and that those regulations define "defense article" to include "technical data" but specifically to exclude "basic marketing information,"[10] and further define "technical data" itself to exclude "basic marketing information."

In *United States v. Chi Mak*, 683 F.3d 1126 (9th Cir. 2012), we upheld instructions that were effectively the same as those given here. In that case, the defendant argued that the

---

[9] After multiple exchanges, instructions 2, 12, 13, and 14, the instructions now challenged by Gowadia, were characterized by the district court as agreed-upon instructions. Gowadia did not object.

[10] The definition of "public domain" appeared between the descriptions of Count 2 and Counts 12, 13, and 14, which immediately followed. The sentences defining "technical data" to exclude "basic marketing information" preceded the descriptions of the individual counts.

jury instructions "relieved the Government of its burden to prove the documents were not in the public domain," because one of the instructions could have been read to say that certain information that Mak allegedly exported was "technical data" as a matter of law.[11] *Id.* at 1136–37. The challenge was unsuccessful because the district court "specifically instructed the jury that any information in the public domain cannot be 'technical data.'" *Id.* at 1137.

Here, as in *Chi Mak*, the district court "specifically instructed the jury" that the government had to prove that any defense services or technical data "were not in the public domain," and that defense services and technical data by definition excluded "basic marketing information." It is not important, under *Chi Mak*, that the "basic marketing information" caveat in Gowadia's case appeared in instructions separate from the instructions listing the elements of the counts in question. In *Chi Mak*, the definition of

---

[11] The instruction in *Chi Mak* read as follows (text in italics is identical):

> All technical data is subject to export control. Technical data is information *required for the design, development, production, manufacture, assembly, operation, testing, or modification of defense articles.* Technical data does not include information in the public domain.

> You are instructed that the information in the Solid State document and the Q.E.D. document is *required for the design, development, production, manufacture, assembly, operation, testing, or modification of defense articles*. You must accept this fact as true, regardless of whether you heard any witness testify to the contrary.

683 F.3d at 1132 (emphasis added).

"technical data" and the caveat regarding information "in the public domain" appeared in an instruction distinct from the instruction laying out the elements of the offense. *See id.* at 1132. The "public domain" instruction in Gowadia's case was arguably even clearer than the one approved in *Chi Mak*, since it appeared in the lists of elements for the various charges.

Reviewing the jury instructions "as a whole," *United States v. Frega*, 179 F.3d 793, 806 n.16 (9th Cir. 1999), we hold that there was no error as to the "public domain" or "basic marketing information" instructions.

Gowadia's conviction is **AFFIRMED.**