**12-2403-cr**
**United States v. Gonzalez**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2013

(Argued:  November 26, 2013          Decided: August 21, 2014)

Docket No. 12-2403-cr

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

Appellee,

v.

FREDDIE GONZALEZ,

Defendant-Appellant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:   KATZMANN, Chief Judge, WINTER, and CALABRESI,
Circuit Judges.

Appeal from a judgment of conviction entered in the United States District Court for the Southern District of New York (Shira A. Scheindlin, Judge), following a jury trial.  Appellant was convicted on four counts of intentional murder while engaged in a narcotics-related trafficking crime involving at least five kilograms of cocaine.  Holding that his confessions were properly admitted, we affirm.

TINA SCHNEIDER, Esq., Portland, ME,
for Defendant-Appellant.

MICHAEL D. MAIMIN, Assistant United States Attorney (Laurie A. Korenbaum, Jessica R. Lonergan, Brent S. Wible, Assistant United States Attorneys, on the brief) for Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, for Appellee.

WINTER, Circuit Judge:

Freddie Gonzalez appeals from his conviction, after a two-week jury trial before Judge Scheindlin, on four counts of intentional murder while engaged in a trafficking crime involving five or more kilograms of cocaine, in violation of 21 U.S.C. § 848(e) and 18 U.S.C. § 2. He was sentenced to concurrent sentences of life imprisonment on each count.

Appellant challenges his conviction on several grounds. Through counsel, he argues that: (i) his confession was obtained in violation of his Fifth and Sixth Amendment rights; (ii) Judge Scheindlin should not have excluded a potentially exculpatory statement by the child of one of the murder victims; and (iii) his trial counsel's failure to locate a potential defense witness constituted ineffective assistance of counsel. Appellant, in a pro se brief, raises additional claims of allegedly improper witness identification procedures and destruction of physical evidence. We hold that appellant's pre-arraignment inculpatory statements were admissible under the six-hour safe harbor

2

provided by 18 U.S.C. § 3501(c).  His additional arguments have no merit.  We therefore affirm.

                              BACKGROUND

a)  The Four Murders

   Because appellant was convicted by a jury, we view the evidence and reasonable inferences drawn therefrom in the light most favorable to the government.  See United States v. Heras, 609 F.3d 101, 103 (2d Cir. 2010) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

   The evidence against appellant included signed confessions he made to government agents while serving a term of imprisonment for an unrelated offense.  We will discuss the circumstances of these statements in more detail infra.  The government's case also included the testimony of Alejandro Rodriguez, a cooperating witness from appellant's former gang, and police reports and physical evidence from the murder investigations.

   The murders took place over the course of five months in early 1990 and were part of a drug war between rival gangs in the Bronx, New York.  Appellant, a native and citizen of the Dominican Republic, was a member of a gang that sold cocaine out of an apartment complex.  The gang obtained its supply in part by robbing other dealers.  Two of the murders were of a rival drug dealer and his wife.  The other murders took place during robberies.

The rival dealer, named Carmelo "Vichan" Gonzalez, no relation to appellant (hereinafter "Carmelo"), had run a distribution ring out of the same apartment complex, but appellant had taken over that location for his own drug business. Carmelo was trying to reestablish his business, and, believing that it was a kill-or-be-killed situation, appellant sent two of his associates on an unsuccessful mission to kill Carmelo in February 1990. On August 11, 1990, appellant and members of his gang went to Carmelo's home, broke in, went up to Carmelo's room, and shot him and his wife to death while they were asleep in bed. Carmelo's young son was asleep in the next room with Carmelo's brother Vincent. When the police arrived, they interviewed both Vincent and the child. Ballistics analysis and autopsies of Carmelo and his wife revealed that they had been shot by four different weapons; rare blue-tipped, 9mm bullets were recovered from each of them.

On September 25, 1990, appellant went with three associates to rob a suspected Bronx-based drug dealer named Clement Bedword. When Bedword resisted getting into appellant's minivan, appellant shot him and pulled him into the vehicle. The men took Bedword to a wooded area in Yonkers, threw him out of the van, and shot him again. The men then returned to his apartment and took drugs, guns, and money. The police found shell casings near Bedword's body and, upon entering his apartment, found a scale

4

and a bulletproof vest but no drugs or money; the apartment appeared to have been burglarized.  Bullet casings recovered from the woods matched those from the earlier Bronx shooting.

The fourth and final murder was of Carlos Polanco, another drug dealer.  On November 10, 1990, appellant, Rodriguez, and several others went to Polanco's home to rob it.  Polanco refused entry, and the gang fatally shot him.  The subsequent investigation uncovered several blue-tipped, 9mm bullets in Polanco as well as .45-caliber shells that matched those found at the Carmelo murder site.

In October 1990, appellant attempted to murder another drug dealer, Henry Perez, during a robbery on Long Island.  Appellant, Rodriguez, and several other men drove to Perez's house.  The men attempted to grab Perez when he arrived, shooting him when he appeared to pull a gun.  The bag Perez was carrying turned out not to have drugs in it, and the men drove away.

b) <u>Confessions</u>

Years later, on July 24, 2008, appellant was indicted, and an arrest warrant for him was issued, for the murder of Polanco.  The next day, while incarcerated and being held for deportation at McRae Correctional Facility in Georgia on unrelated federal immigration offense, he was visited by federal and state agents.  These were:  criminal investigator Billy Ralat of the United States Attorney's Office, former NYPD detective

Stefano Braccini, and Yonkers detectives John Geiss and Wilson Gonzalez (no relation to appellant).  A writ ad prosequendum was lodged on July 28, 2008, the next business day.

Ralat, who is bilingual, led the interview and initially spoke in Spanish, which only he and detective Gonzalez spoke. The door to the interview room was shut, but unlocked, although appellant claims that he did not know this.  After an initial conversation, which began shortly after 11:00am, Ralat gave appellant a Spanish-language Miranda form.  Appellant indicated that he understood his rights but wrote "no" next to the inquiry as to whether he was willing to answer questions.  The form was signed at 11:24am.  According to the agents, Ralat then told appellant that the interview was over, and the agents began to leave.  One or more agents told appellant that they would see him in New York and that he would not be returning to the Dominican Republic.  Appellant then said he wanted to speak to the agents and told them not to leave.

The agents' accounts of what happened next are slightly varied.  Each stated that they decided to read the Miranda warnings to appellant again.  Ralat testified that he proceeded to describe the benefits of cooperation and appellant's option of going to trial but did not question him for another 45-50 minutes.  Ralat gave appellant a second Miranda form, this one in

English (which appellant spoke), and appellant answered "sí" to each question. This form was signed at 12:30pm.

Appellant contends that he was questioned regarding the murders both before and after the first <u>Miranda</u> form was signed. Ralat stated, however, that questioning commenced only after the second <u>Miranda</u> form was signed, after which point the conversation switched to English, with detective Geiss, who spoke no Spanish, participating as well.

Appellant eventually signed three confessions written in Spanish. The first confession, regarding the murder of Polanco, was dated 12:50pm at the beginning and 1:15pm at the signature block. The second, regarding the murders of Carmelo and his wife, notes times of 2:25 and 2:40pm for its beginning and end. The final confession, regarding the murder of Bedword, was noted as beginning at 2:55pm and ending at 3:10pm. Appellant did not ask for an attorney during the interview.

c) <u>Trial Proceedings</u>

Appellant moved to suppress the written confessions before trial, claiming that the interrogation had been coercive and that he had invoked his rights to counsel and to remain silent. After briefing and oral argument, the district court denied his motion. In a written opinion, the court held that appellant's rights had not been violated because he had reinitiated contact after the first <u>Miranda</u> form and the confession had been obtained before

expiration of a six-hour safe harbor period for questioning between arrest and presentment.

The district court also granted the government's motion in limine to exclude a police report containing the testimony of Carmelo's young son regarding the murder of Carmelo and his wife. The court found that there was no evidence the child had actually seen the shooting and that the police officer had been improperly suggestive in his questioning. Gonzalez was convicted by the jury on all four counts of murder, and the district court sentenced him to concurrent terms of life imprisonment on each count.

DISCUSSION

We first discuss the arguments by counsel: (i) that appellant's confession was erroneously admitted because it was obtained in violation of his Fifth and Sixth Amendment rights; (ii) that the district court's exclusion of the testimony of Carmelo's son was error; and (iii) that his trial counsel's failure to locate an eyewitness to the Bedword murder constituted ineffective assistance of counsel.

a) Admission of Gonzalez's Confessions

We review a district court's decision on a suppression motion de novo on questions of law and for clear error in factual determinations. United States v. Stewart, 551 F.3d 187, 190-91 (2d Cir. 2009). Under clear error review, we uphold findings of

8

fact that are "plausible in light of the record viewed in its entirety." United States v. Reilly, 76 F.3d 1271, 1276 (2d Cir. 1996) (quoting Anderson v. City of Bessemer, 470 U.S. 564, 573-74 (1985)).

(1)  Miranda Analysis

Appellant claims first that his confessions were obtained in violation of his Miranda rights, because he indicated on the first Miranda waiver form that he was not willing to answer questions.  See generally Miranda v. Arizona, 384 U.S. 436 (1966).  Statements obtained in violation of Miranda are of course subject to a prophylactic rule of exclusion. Dickerson v. United States, 530 U.S. 428, 443-44 (2000).  Once Miranda rights have been invoked, interrogation must stop and the invocation must be "scrupulously honored."  Michigan v. Mosley, 423 U.S. 96, 104 (1975).  However, a waiver can occur subsequent to an initial invocation of Miranda rights if the suspect reinitiates communication.  Edwards v. Arizona, 451 U.S. 477, 485 (1981); Wood v. Ercole, 644 F.3d 83, 90 (2d Cir. 2011).

The government must prove by a preponderance of the evidence that a defendant's waiver of Miranda rights was knowing, voluntary, and intelligent. Colorado v. Connelly, 479 U.S. 157, 168 (1986); Miranda, 384 U.S. at 444.  Whether a waiver occurred is determined by viewing the totality of the circumstances, but for an invocation of Miranda rights to trigger exclusion, the

9

invocation must be "unambiguous." <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 381 (2010); <u>see also</u> <u>id.</u> at 384 (waiver may be implicit); <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986) (totality of the circumstances must show that waiver was voluntary, knowing, and intelligent); <u>United States v. Plugh</u>, 648 F.3d 118, 124-28 (2d Cir. 2011) (comparing invocation and waiver of <u>Miranda</u> rights).

The district court credited the officers' testimony that appellant was not questioned until after he signed the second form. Appellant challenges these findings as clear error. However, his challenges take statements out of context and emphasize various phrases used by the officers without viewing their testimony as a whole. For example, Ralat testified that appellant wanted him to ask "more questions" and "continue to speak." Appellant suggests that these phrases imply that Ralat had already questioned him about the Bedword murder. Similarly, appellant notes detective Gonzalez's testimony that Ralat told the others that appellant did not want to speak to them "anymore," before they re-Mirandized and interrogated him. Braccini also stated that appellant said he wanted to "continue" to speak. However, all four detectives explicitly testified that appellant was not interrogated prior to waiving his rights on the <u>Miranda</u> form. Given that, we cannot say the district court's findings in this regard were clear error.

10

Appellant also relies upon Geiss's notes, which indicate that Ralat questioned him regarding the Bedword murder after signing the first but before signing the second Miranda form. However, Geiss's notes were not contemporaneous. His contemporaneous notes stated only "rights" and the times of appellant's signing of the two Miranda forms: 11:24am and 12:35pm. Moreover, Geiss does not speak Spanish and could not follow the initial conversation. Appellant's arguments, therefore, are insufficient to compel a ruling that the district court's factual determination of what took place was clear error.

Appellant's claim that the second form was invalid turns on how contact was reinitiated. We need not determine whether appellant's answer of "no" on the first Miranda form constituted an unambiguous invocation of his Miranda rights. Cf. Plugh, 648 F.3d at 125 ("[A] refusal to *waive* rights, however unequivocal, is not necessarily equivalent to an unambiguous decision to invoke them."). Even assuming arguendo that the initial invocation was unambiguous, it was overridden by appellant's subsequent decision to reinitiate the conversation by asking the agents not to leave, indicating that he wanted to speak with them. See Edwards, 451 U.S. at 484-85.

Appellant, not the agents, reinitiated the contact before questioning began. Prior to his reinitiation of the contact, the agents merely told appellant that he had already been indicted

11

and would thus be taken to New York.  This was not an interrogatory statement that was "reasonably likely to elicit an incriminating response."  Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  It was not even a question, but simply an accurate statement of what was going to happen next.

Moreover, appellant's confession did not immediately follow, but instead came only after an extended explanation of his rights and options.  There is nothing in the record to suggest that the agents engaged in a coercive conversation as, for example, in Mosley, where the officers "refus[ed] to discontinue the interrogation upon request or [] persist[ed] in repeated efforts to wear down his resistance and make him change his mind."  Mosley, 423 U.S. at 105-06.  On the contrary, according to testimony credited by the district court, Ralat stopped the interview once appellant wrote "no" on the first form.  Ralat began again only at appellant's insistence and after going once more over appellant's options and giving him the second waiver form.

(2)  Speedy Presentment Analysis

Gonzalez also contends that his confession was obtained in violation of the duty to speedily present a defendant before a magistrate judge, see Fed. R. Crim. P. 5(a)(1)(A), and should have been suppressed pursuant to 18 U.S.C. § 3501.  Rule 5(a)(1)(A) requires law enforcement to present arrestees "without

12

unnecessary delay," and we will exclude confessions obtained following an unnecessary or unreasonable delay in presentment, see Corley v. United States, 556 U.S. 303, 322 (2009). However, there is a safe harbor provided in 18 U.S.C. § 3501(c) that bars suppression based on an unreasonable delay if the confession was made "within six hours immediately following his arrest or other detention." If the confession was made outside that six-hour period, "the court must decide whether delaying that long was unreasonable or unnecessary under the McNabb-Mallory cases, and if it was, the confession is to be suppressed." Corley, 556 U.S. at 322 (citing the rule of Mallory v. United States, 354 U.S. 449 (1957) and McNabb v. United States, 318 U.S. 332 (1943)).

Whether or not his confession falls within the section 3501(c) safe harbor therefore depends on when appellant was "arrested" for the purposes of section 3501. Appellant's final incriminating statement was finished at 3:10pm, or approximately four hours after the agents first met with Gonzalez at 11:00am that morning. Appellant acknowledges that he was not formally arrested during the interview. He instead urges us to consider him constructively arrested at the moment when the government had the authority to effectuate the arrest, i.e., when the arrest warrant was issued on July 24.

Section 3501 applies only after "there is some obligation to bring the person before [] a [federal] judicial officer in the

13

first place," generally pursuant to an "arrest[] for a <u>federal</u> offense." <u>United States v. Alvarez-Sanchez</u>, 511 U.S. 350, 358 (1994) (citing Fed. R. Crim. P. 5(a)). Few courts have had opportunity to determine precisely when this obligation is triggered in a context other than a formal arrest, but caselaw indicates that the indictment alone does not trigger it. <u>See, e.g.</u>, <u>United States v. Nguyen</u>, 313 F. Supp. 2d 579, 592-93 (E.D. Va. 2004) (section 3501 and <u>McNabb-Mallory</u> "are exclusively concerned with delays between a defendant's arrest or detention and his arraignment . . . . [not] delays between a defendant's indictment and his arraignment. . . . [Defendant's] indictment did not give rise to an obligation to bring him in front of a judicial officer.")

Appellant attempts to distinguish these precedents, particularly <u>Alvarez-Sanchez</u>, because, unlike the defendant in those cases, he was in federal, not state, custody. However, in <u>Alvarez-Sanchez</u>, the majority's opinion rested on the "duty, obligation, or reason" to bring the defendant in front of a judge for a given crime; the federal/state distinction simply highlighted the lack of obligation in the context of that case. <u>See Alvarez-Sanchez</u>, 511 U.S. at 358. Our inquiry, therefore, is when the obligation arose to present appellant for the murders with which he was charged. Gonzalez's federal detention until that point was on unrelated federal immigration charges, and

14

neither his indictment nor the issuance of an arrest warrant altered the character of the defendant's detention.  We hold that section 3501(c) was not immediately triggered by the present indictment and issuance of an arrest warrant.

Nevertheless, we recognize the potential for some abuse in a system allowing unfettered interrogation of defendants who are incarcerated on other charges.  See id. 359-60 (recognizing potential for collusion between federal and state agents to arrest and detain on one charge in order to interrogate on another); United States v. Perez, 733 F.2d 1026, 1036 (2d Cir. 1984) (acknowledging that the court was "troubled by the practice" of pre-arraignment interviews because indigent defendants often do not have counsel until one is appointed at arraignment).  While section 3501(c) evinces a congressional intent to allow some questioning to take place before presentment, it is also clear that this period must be limited.

Therefore, we hold that defendants in federal custody on earlier unrelated charges, but for whom an arrest warrant on new charges is issued, are "arrested" for purposes of section 3501 once any questioning on the new charges begins.  Because Gonzalez's first interaction with the government on these charges coincided with the beginning of his questioning, we need not decide on the facts of this appeal what other actions by the government might constitute 'other detention' for purposes of

15

Section 3501(c) and the McNabb-Mallory rule. Any incriminating statement obtained within the six-hour safe harbor provided by 3501(c) is admissible, provided, of course, other applicable constitutional requirements are met. Because appellant's incriminating statements took place within this window and his Fifth and Sixth Amendment Miranda rights were not otherwise violated, the district court did not err in refusing to suppress appellant's confessions.

b) Exclusion of Child Witness Testimony

Evidentiary rulings are reviewed for abuse of discretion. United States v. Persico, 645 F.3d 85, 99 (2d Cir. 2011). Errors are not grounds for reversal if they are harmless, i.e., if there is "fair assurance" that the "judgment was not substantially swayed by the error." Kotteakos v. United States, 328 U.S. 750, 764-65 (1946).

Appellant sought to introduce a police report of statements made by Carmelo's young son to an officer following the murders of Carmelo and his wife. In excluding it, the district court noted the "scant contextual information available" regarding the officer's questioning of the boy, including what the boy actually witnessed. App. at 214. The court further found that the interviewing officer had been improperly suggestive and that there was no evidence the boy was actually an eyewitness. Id. at 214-15. The court therefore concluded, pursuant to the Rule 403

16

balancing test, Fed. R. Evid. 403 (a court may exclude relevant evidence if its probative value is substantially outweighed by at least one of the enumerated factors), that the hearsay statements in the police report were highly prejudicial, bore no indicia of reliability or trustworthiness, and were thus of little probative value. The district court explicitly left open an opportunity for the defense to introduce evidence that the son actually observed relevant events, but appellant failed to do so.

Appellant argues that the son's statements should have been admissible as either present-sense impressions under Fed. R. Evid. 803(1) or as excited utterances under Rule 803(2). However, while those rules solve any hearsay problem, neither solve the problem of the need to show the declarant's first-hand knowledge of the subject matter. Both exceptions are derived from the belief that contemporaneous statements about observed events leave less time to forget or fabricate and, therefore, tend to be reliable. See United States v. Medico, 557 F.2d 309, 315 (2d Cir. 1977). However, there is no evidence that the child actually observed the killings at all. Indeed, according to Vincent, Carmelo's brother and the other potential eyewitness, he and the child had been sleeping in a different room when the shooting began.

Therefore, we cannot say that the district court abused its discretion in finding the statements inadmissible. Furthermore,

17

any error was certainly harmless, since the shock-tinged observations of a young boy would have been pitted against an overwhelming constellation of forensic evidence and a signed confession that unequivocally implicated appellant.

c)  <u>Ineffective Assistance of Counsel</u>

An appellant raising an ineffective assistance claim must meet the requirements of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), which requires a convicted defendant to:  (i) show that counsel's performance was objectively unreasonable and (ii) "affirmatively prove prejudice" from said performance.  <u>Id.</u> at 687-88, 693.  Appellant has met neither requirement.

Appellant's argument is based on the following events.  In the case of the Bedword murder, the police report included a statement by a neighbor of the victim, Melva Perry, that the killers had driven a Jeep, had spoken with a Jamaican Patois accent, and had shot Bedword in the head.  Appellant argues that Perry's testimony exculpates him because there is no evidence that he spoke Patois or ever drove a jeep.  The government had given defense counsel a copy of the report in March 2010 with Perry's date of birth, address, and telephone numbers redacted, as was common practice.  Defense counsel did not begin searching for Perry until December 2010 and only then asked the government for her contact information.  Appellant now contends that this delay constituted ineffective assistance that amounted to a <u>per</u>

18

se unreasonable "fail[ure] to present exculpatory evidence."

Gersten v. Senkowski, 426 F.3d 588, 611 (2d Cir. 2005).

Gonzalez fails the first prong of Strickland because, while the delay in searching for the witness was perhaps unwise, it was not unreasonable. Defense counsel did not simply refuse to attempt to locate and subpoena Perry; he was unable to do so, as was the government. Moreover, even if defense counsel was unreasonably derelict, Perry's eyewitness evidence, offered 20 years later and at least partially inaccurate -- Bedword was not shot in the head -- would not have altered the outcome of the case in light of appellant's confession and corroborating evidence. Appellant therefore has not met his burden under either prong of Strickland.

d) Additional *Pro Se* Arguments

Appellant raises additional claims in a pro se brief that largely duplicate the arguments made by counsel. However, he does raise two additional arguments: (i) detective Geiss used impermissibly suggestive identification procedures in mailing photographs of various parties involved in the Carmelo Gonzalez murders; and (ii) appellant was denied a fair trial because the physical evidence of the guns and ammunition used in the murders had been destroyed by the Rhode Island police and was not available for trial. Neither argument has merit.

19

Appellant did not move to suppress the identification and thus waived this issue.  See Fed. R. Crim. P. 12(e) (party who fails to move to suppress evidence before the deadline set by the district court has waived any defenses or claims relating to that suppression).  Moreover, Geiss was not suggestive.  He phoned Milagros Santiago, the sister of Carmelo's wife, regarding the shooting and the apartment complex, where she also lived.  Geiss then sent Santiago 13 photos of various people who lived in the complex, which she annotated with their name and how she knew them.  She did not annotate appellant's picture because she had already discussed appellant with Geiss on the phone, and even that discussion was appellant's his role as a drug dealer, not his involvement in the murder.  This was not even an identification, much less a suggestive one, and any error was harmless for reasons stated earlier.

Appellant's Fifth Amendment claim regarding the destruction of evidence is reviewed for plain error, because it also was not raised at trial.  Fed. R. Crim. P. 52(b).  The Rhode Island State Police had confiscated guns and ammunition, including the rarer blue-tipped bullets, when they arrested appellant in 1990.  In 2008, Geiss contacted Rhode Island's officials in an attempt to obtain the evidence for appellant's federal trial, but it had been destroyed years earlier, pursuant to an internal practice of eliminating seized property approximately one year after the end

of a case.  Appellant points to no authority requiring police to retain seized property indefinitely and against the backdrop of his confession there is no conceivable prejudice that resulted from the evidence's absence.

CONCLUSION

For the reasons stated, we affirm.