**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 23-393 |
| *Plaintiff - Appellee*, | D.C. No. 4:15-cr-01390-JGZ-EJM-3 |
| v. | |
| ABELARDO RODRIGUEZ-ARVIZU, | OPINION |
| *Defendant - Appellant*. | |

Appeal from the United States District Court
for the District of Arizona
Jennifer G. Zipps, District Judge, Presiding

Argued and Submitted October 24, 2024
Phoenix, Arizona

Filed March 17, 2025

Before: MILAN D. SMITH, JR., BRIDGET S. BADE, and
DANIELLE J. FORREST, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Concurrence by Judge Danielle J. Forrest

# SUMMARY[*]

## Criminal Law

The panel affirmed the district court's denial of Abelardo Rodriguez-Arvizu's motion to suppress his post-arrest statements in a case in which the district court subsequently found Rodriguez-Arvizu guilty, at a bench trial, of offenses related to his participation in a marijuana "rip crew"—a group of armed individuals who steal drugs from smugglers.

The panel held that suppression of Rodriguez-Arvizu's statements is not warranted for FBI agents' violation of Fed. R. Crim. P. 4(c)(3)(A), which provides that an arresting officer who does not possess a copy of the arrest warrant "must inform the defendant of the warrant's existence and of the offense charged." Here, it is illogical to conclude that the agents' failure to tell Rodriguez-Arvizu the precise charges prompted his incriminating statements; Rodriguez-Arvizu's Fifth Amendment right against self-incrimination was not implicated as he was not yet in custody; and there was no evidence that the agents engaged in the kind of deliberate, reckless, or grossly negligent conduct that the exclusionary rule is meant to deter.

The panel held that the district court did not err in declining to suppress the statements based on a violation of Rodriguez-Arvizu's Fifth Amendment right to counsel. The panel concluded that Rodriguez-Arvizu's failure to sign the waiver portion of an Advisement of Rights Form was not sufficient on its own to invoke his Fifth Amendment right to

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

counsel. In addition, Rodriguez-Arvizu made spontaneous statements during the ride to the FBI office that reinitiated questioning, and the totality of the circumstances demonstrates that he knowingly and intelligently waived his Fifth Amendment right to counsel following this reinitiation.

The panel held that the district court did not err in denying Rodriguez-Arvizu's motion to suppress his statements under the Sixth Amendment. The panel rejected Rodriguez-Arvizu's suggestion that there is a categorical rule that a defendant must be notified of the charges in an indictment before he can validly waive his Sixth Amendment rights. Rather, the Sixth Amendment inquiry is contextual, and a waiver of the right to counsel is valid if the circumstances indicate the defendant was apprised of his rights, the criminal liability he potentially faced, and the gravity of his situation. Applying this rule, the panel concluded that the district court did not err in determining that the Government met its burden of proving that Rodriguez-Arvizu voluntarily, knowingly, and intelligently waived his Sixth Amendment right to counsel.

The panel held that the district court did not err in denying Rodriguez-Arvizu's motion to suppress his statements based on an alleged violation of 18 U.S.C. § 3501 and the *McNabb-Mallory* rule. Rule 5(a)(1)(A) of the Federal Rules of Criminal Procedure provides in relevant part that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge." The *McNabb-Mallory* rule clarifies that if this rule is violated, an arrested person's confession is presumptively inadmissible. *McNabb-Mallory* was modified by 18 U.S.C. § 3501(c), which created a safe harbor by stating that a confession is admissible so long as the confession was given within six hours immediately

following the defendant's arrest or other detention. Because the statutory scheme supports the conclusion that there can be independent triggers for the six-hour safe harbor period for unrelated federal charges, and because the circumstances of Rodriguez-Arvizu's two arrests demonstrate that the relevant six-hour clock only began upon his formal arrest by FBI agents rather than any earlier point, Rodriguez-Arvizu's confession took place within the safe harbor period. Accordingly, there was no violation of § 3501(c) and the panel did not reach the issue of unnecessary and unreasonable delay.

Judge Forrest concurred in part and concurred in the judgment. She joined Sections I-III of the majority opinion, and agreed that suppression is unwarranted under § 3501 and the *McNabb-Mallory* rule, but would resolve that issue differently. In her view, there is not a clear answer for when the safe-harbor period began in this case, but that question need not be resolved because Rodriguez-Arvizu's confession does not warrant exclusion regardless of when the safe-harbor period began.

---

## COUNSEL

Craig H. Russell (argued), Ashley B. Culver, and Matthew Cassell, Assistant United States Attorneys; Christina M. Cabanillas, Deputy Appellate Chief; Gary M. Restaino, United States Attorney; Office of the United States Attorney, Tucson, Arizona; for Plaintiff-Appellee.

Francisco Leon (argued), Law Office of Francisco Leon, Tucson, Arizona, for Defendant-Appellant.

## OPINION

M. SMITH, Circuit Judge:

Defendant-Appellant Abelardo Rodriguez-Arvizu appeals the district court's denial of his motion to suppress his post-arrest statements. This appeal presents four questions: whether the district court erred in denying Rodriguez-Arvizu's motion to suppress based on (1) an alleged violation of Fed. R. Crim. P. 4(c)(3)(A); (2) an alleged violation of his Fifth Amendment rights; (3) an alleged violation of his Sixth Amendment rights; and (4) an alleged violation of 18 U.S.C. § 3501 and *McNabb-Mallory*. Because we find no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 18, 2019, Defendant Abelardo Rodriguez-Arvizu was arrested by United States Border Patrol agents in Sasabe, Arizona, on a suspected immigration violation. Thereafter, Rodriguez-Arvizu was transported from Sasabe to Tucson, where he underwent booking procedures at approximately 10:00 p.m. Because the Tucson facility was filled to capacity, Rodriguez-Arvizu was then transported to the Douglas Border Patrol Station.

During his processing in Douglas at approximately 5:30 p.m. the next day, a criminal records check revealed an outstanding arrest warrant entered into the system by FBI Special Agent Michelle Terwilliger. Agent Terwilliger had been assigned to investigate an October 24, 2014, incident during which Border Patrol agents shot and killed Edgar Amaro-Lopez, a member of a five-person marijuana "rip crew" (a group of armed individuals who steal drugs from smugglers). The arrest warrant for Rodriguez-Arvizu was

issued following a September 7, 2016, superseding indictment charging him with offenses related to his alleged participation in the marijuana rip crew through the October 24, 2014, incident.

After discovering the warrant, a Border Patrol agent contacted Agent Terwilliger, who requested that Rodriguez-Arvizu be transported back to Tucson so that she could pick him up the next day. Agent Hector Verduzco, the Border Patrol agent who processed Rodriguez-Arvizu in Douglas, prepared I-213, I-214, and I-215 Forms for Rodriguez-Arvizu. Both the I-214 Form (Advisement of Rights Form) and I-215 Form (Record of Sworn Statement in Affidavit Form) provided a notice of *Miranda* rights. Rodriguez-Arvizu signed the I-214 Form but left the specific "waiver" portion of the form unsigned. Agent Verduzco also marked "no" on the I-215 Form as Rodriguez-Arvizu's response when asked if he was willing to answer questions. Agent Verduzco did not question Rodriguez-Arvizu about the charges in the warrant or inform him of the FBI's outstanding warrant for his arrest.

Following his processing at the Douglas Border Patrol Station, Rodriguez-Arvizu was transported back to Tucson, where he arrived at approximately 1:30 a.m. on November 20, 2019. Agent Terwilliger, who did not speak Spanish, and FBI Agent Oscar Ramirez, from whom Agent Terwilliger requested assistance in part due to his fluency in Spanish, arrested and took custody of Rodriguez-Arvizu at approximately 9:45 a.m. Neither Agent Terwilliger nor Agent Ramirez told Rodriguez-Arvizu the specific charges he faced, although Agent Ramirez testified that he told Rodriguez-Arvizu "that he was arrested, he was being arrested on a federal warrant, that we were FBI agents, and that we were going to take him for [processing] and an

interview at the FBI office." Agent Terwilliger also testified that she typically tells someone she is arresting that they are being arrested on an FBI warrant and that she believed that both she and Agent Ramirez showed Rodriguez-Arvizu their law enforcement identification.

During the approximately eight- to ten-minute ride to the FBI office, Rodriguez-Arvizu made several spontaneous statements to Agent Ramirez in Spanish. Agent Ramirez testified that Rodriguez-Arvizu made comments (1) asking about the charges, (2) asking for a telephone call, (3) asking if the arrest "had anything to do with Edgar," (4) stating that the Border Patrol shot Edgar, (5) and asking whether he was going to get eight years (the same sentence that another member of the rip crew received). Agent Ramirez testified that he did not initiate any of these conversations and that whenever Rodriguez-Arvizu would make a statement, he generally advised Rodriguez-Arvizu that he "could not talk to him there inside the vehicle" and that the agents "would have an opportunity to talk to him at the FBI office."

Once at the FBI office, Agent Ramirez read Rodriguez-Arvizu his *Miranda* rights and confirmed that he understood those rights. After reviewing the *Miranda* rights, Agent Ramirez explained that Rodriguez-Arvizu was "in control of everything," he could tell them "when to stop," and stated, "Before speaking, before being able to tell you about things that we know, we need your permission." Agent Ramirez asked Rodriguez-Arvizu if he understood all his rights. Rodriguez-Arvizu responded, "Of course." He had previously responded "Yes" when asked if he understood his specific rights—including the right to counsel. Rodriguez-

Arvizu then asked repeatedly if he needed an attorney.[1] Agent Ramirez clarified that Rodriguez-Arvizu had the right to an attorney and could have one if he wished. Rodriguez-Arvizu then stated, "Go ahead and get it over with." At various other points in the interview, Rodriguez-Arvizu mentioned an attorney, and each time Agent Ramirez clarified that Rodriguez-Arvizu could end the interview and retain counsel if he wished to do so. When Agent Ramirez asked Rodriguez-Arvizu if he wanted "to continue talking" after he referenced an attorney, he said, "Well, yes, yes, yes." And when asked if he gave Agent Ramirez "permission to continue speaking with [him] without an attorney," Rodriguez-Arvizu responded, "Sure!" During the interview, Rodriguez-Arvizu detailed his presence at and knowledge of the October 24, 2014, incident. At around 2:00 p.m. on November 20, 2019, Rodriguez-Arvizu had his initial appearance before a federal magistrate judge on the charges in the superseding indictment.

Rodriguez-Arvizu subsequently moved to suppress his statements in the car and at the station based on violations of (1) Fed R. Crim. P. 4(c)(3)(A); (2) the Fifth Amendment because FBI agents questioned him after he had invoked his *Miranda* rights while in Border Patrol custody; (3) the Sixth Amendment right to counsel because he did not voluntarily, knowingly, and intelligently waive that right; and (4) 18 U.S.C. § 3501(c) and *McNabb-Mallory* because he was not

---

[1] Rodriguez-Arvizu asked three similar questions after Agent Ramirez asked if he understood his rights. These questions have been translated as: (1) "But do I not need an attorney or what?"; (2) "Do I need an attorney or what?"; and (3) "Do I have an attorney or what?" Agent Ramirez contested the third translation and stated that Rodriguez-Arvizu's question was closer to, "An attorney, how do I get one or what?"

promptly presented to a magistrate judge following his arrest by the Border Patrol. *United States v. Rodriguez-Arvizu*, No. CR-15-01390-003-TUC, 2021 WL 8342942, at \*1 (D. Ariz. Oct. 12, 2021). The magistrate judge who heard the motion to suppress recommended that the district court suppress Rodriguez-Arvizu's statements based on the first three grounds. *Id.*

The district court denied the motion to suppress. *United States v. Rodriguez-Arvizu*, No. CR-15-10390-003-TUC, 2022 WL 1164880, at \*1 (D. Ariz. Apr. 20, 2022). The district court found that (1) Fed. R. Crim. P. 4(c)(3)(A) was violated but suppression was not warranted; (2) Rodriguez-Arvizu's Fifth Amendment right to counsel was not violated because he did not unambiguously invoke his right when he failed to sign the waiver portion of his advice of rights form; (3) Rodriguez-Arvizu could validly waive his Sixth Amendment right to counsel despite not knowing the specific charges against him; and (4) *McNabb-Mallory* and 18 U.S.C. § 3501(c) were not violated because the arrest by the FBI created a second trigger for the safe harbor clock. *Id.* at \*4–6, \*10–12.

At the subsequent bench trial, the district court found Rodriguez-Arvizu guilty of three of the four counts listed in the superseding indictment.[2] The district court sentenced Rodriguez-Arvizu to 117 months' imprisonment followed by three years of supervised release. Rodriguez-Arvizu timely appealed the denial of his motion to suppress.

---

[2] The second count—possession of a firearm in furtherance of a crime of violence—was dismissed before trial.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction pursuant to 28 U.S.C. § 1291. *United States v. Booker*, 952 F.2d 247, 249 (9th Cir. 1991). We review the district court's denial of a motion to suppress de novo. *United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc). We review the underlying factual findings for clear error. *Id.*

## ANALYSIS

### I. The district court did not err in denying Rodriguez-Arvizu's motion to suppress his post-arrest statements based on a violation of Fed. R. Crim. P. 4(c)(3)(A).

Pursuant to Fed. R. Crim. P. 4(c)(3)(A), an arresting officer who does not possess a copy of the arrest warrant "must inform the defendant of the warrant's existence and of the offense charged." The Government does not contest the district court's finding that the FBI agents did not tell Rodriguez-Arvizu the specific charges against him, but instead argues that "any failure" that occurred does not warrant application of the exclusionary rule.

Since the initial adoption of the Federal Rules of Criminal Procedure over eighty years ago, there has been little litigation regarding Rule 4(c)(3)(A). Notably, no court has yet held that suppression is warranted for a violation of this rule. Nonetheless, Rodriguez-Arvizu argues that suppression is justified in this case because Agent Ramirez "intentional[ly]" violated the rule for the purpose of circumventing his "important rights." Rodriguez-Arvizu alleges that Agent Ramirez "disingenuously" stated that he did not know what charges Rodriguez-Arvizu faced when he picked up Rodriguez-Arvizu from the Border Patrol station

and that Agent Ramirez "manipulated" Rodriguez-Arvizu by stating that he could not tell Rodriguez-Arvizu about the charges until after Rodriguez-Arvizu waived his *Miranda* rights. Rodriguez-Arvizu argues that "[m]ore than mere negligence is involved" and requests application of the exclusionary rule to deter future violations of this rule and to "avoid its use as a tactic to obtain *Miranda* waivers from defendants."

We agree with the district court that suppression is not warranted for the FBI agents' violation of Rule 4(c)(3)(A). Under Supreme Court precedent, suppression is a "last resort." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). That a violation is a "but-for" cause of obtaining the disputed evidence is a necessary but not sufficient condition for applying the exclusionary rule. *Id.* at 592. Rather, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009). "The exclusionary rule does not apply 'when law enforcement officers have acted in objective good faith or their transgressions have been minor.'" *United States v. Henderson*, 906 F.3d 1109, 1118 (9th Cir. 2018) (quoting *United States v. Leon*, 468 U.S. 897, 908 (1984)).

Agent Terwilliger's and Agent Ramirez's failure to inform Rodriguez-Arvizu of the precise charges against him does not meet the high bar required for suppression. As an initial matter, Rodriguez-Arvizu knew he was under arrest on federal charges, even if he did not know the specific charges, and his comments in the car did not stem from any questioning by the agents. In this context, it is illogical to conclude that the failure to tell him the precise charges

therefore prompted the incriminating statements he made in the car. As the district court explained, "[t]he fact that the offense information is not provided does not compel one to make inculpatory statements." *Rodriguez-Arvizu*, 2022 WL 1164880, at *5 n.4. Despite the violation of Rule 4(c)(3)(A), Rodriguez-Arvizu still possessed enough contextual information that he should have been aware of the risk of making the kinds of statements (e.g., asking if the arrest "had anything to do with Edgar") that he made on the way to the FBI office.

Moreover, as the district court also pointed out, if we assume—as the D.C. Circuit has speculated—that Rule 4(c)(3)(A) was meant to protect a defendant's Fifth Amendment right against self-incrimination, that right was not implicated here. *Id.* at *2–5 (citing *Bryson v. United States*, 419 F.2d 695, 700–03 (D.C. Cir. 1969)). The Fifth Amendment is implicated only in custodial interrogation, *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), and Agent Ramirez did not begin to question Rodriguez-Arvizu until he was at the FBI office and read his *Miranda* rights. *Rodriguez-Arvizu*, 2022 WL 1164880, at *5.

Rodriguez-Arvizu also argues that, during the interview at the FBI office, Agent Ramirez's "phrasing" of the *Miranda* rights suggested that a waiver of those rights "was necessary for the agents to tell him why they want to talk to him." While advising Rodriguez-Arvizu of his *Miranda* rights, Agent Ramirez made statements such as "before being able to speak to you, before being able to converse about the things that you were telling us when we came here, I must notify you of your rights" and "Before speaking, before being able to tell you about the things that we know, we need your permission." The magistrate judge found that Agent Ramirez acted in bad faith when he made these

comments because he "*basically* told the Defendant that he could not answer his question about the charges unless he waived his *Miranda* rights," a conclusion that the district court—reviewing the same interview transcript—firmly rejected. *Id.* at *4 n.3. Like the district court, we find that there was no bad faith here.[3] Agent Ramirez also told Rodriguez-Arvizu that before the agents asked him "any question," he must "give [them] permission to speak." In context, Agent Ramirez's statements imply that he could not tell Rodriguez-Arvizu what the FBI knew about the alleged criminal activity without a waiver, not that he was specifically refusing to tell Rodriguez-Arvizu *why he was arrested* unless he waived his rights. Even if it would have been helpful for Agent Ramirez to be more specific in his various statements while providing the *Miranda* warnings, nothing in his comments or actions demonstrated the kind of "sufficiently deliberate" conduct for which "deterrence is

---

[3] When reviewing the magistrate judge's report and recommendation, the district court stated that "there are no separate findings of fact and no credibility findings." *Rodriguez-Arvizu*, 2022 WL 1164880, at *2. The district court further stated that "[t]he parties do not dispute the Magistrate Judge's summary of the evidence, only the legal significance of the evidence." *Id.* However, on appeal, the Government claims that the district court's finding that there was no bad faith was not "clearly erroneous," implying that the district court made a new finding of fact, not law, when it disagreed with the magistrate judge. Regardless, even under de novo review, we agree with the district court. Notably, even though Rodriguez-Arvizu references the magistrate judge's overturned finding of bad faith, at no point on appeal does Rodriguez-Arvizu argue that the district court created new findings of fact that should have required the district court to hold its own evidentiary hearings. *See United States v. Ridgway*, 300 F.3d 1153, 1155–57 (9th Cir. 2002) (a district court cannot reject the factual or credibility findings of a magistrate judge on a motion to suppress without itself holding an evidentiary hearing).

worth the price paid by the justice system." *Herring*, 555 U.S. at 144.

"[T]he exclusionary rule is not a remedy we apply lightly." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 347 (2006). Due to its "substantial social costs," the Supreme Court has "been 'cautio[us] against expanding' it" and has "repeatedly emphasized that the rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application." *Hudson*, 547 U.S. at 591 (alterations in original) (citations omitted). Here, there was no evidence that the FBI agents engaged in the kind of "deliberate, reckless, or grossly negligent conduct" that the exclusionary rule is meant to deter. *Herring*, 555 U.S. at 144. Moreover, the district court found that there was no evidence that the failure to abide by Rule 4 is a systemic problem either in the FBI or in federal law enforcement more broadly. *Rodriguez-Arvizu*, 2022 WL 1164880, at *5. Therefore, the FBI agents' violation of Fed. R. Crim. P. 4(c)(3)(A) does not warrant suppression of Rodriguez-Arvizu's statements.

## II. The district court did not err in denying Rodriguez-Arvizu's motion to suppress his statements under the Fifth Amendment.

Rodriguez-Arvizu next contends the district court erred in failing to suppress his statements based on a violation of his Fifth Amendment right to counsel. Once an accused person has "expressed his desire to deal with the police only through counsel," that person "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).

However, the accused person "must unambiguously request counsel." *Davis v. United States*, 512 U.S. 452, 459 (1994).

Rodriguez-Arvizu argues that he invoked his right to counsel on November 19, while in Border Patrol custody, which would have prevented the FBI agents from subsequently questioning him. He argues that by failing to sign the waiver portion of the I-214 Form, he invoked both his right to silence and his right to counsel. The district court rejected this argument below, finding that "there is no evidence that the Defendant unambiguously invoked his *Miranda* right to counsel." *Rodriguez-Arvizu*, 2022 WL 1164880, at \*6. The district court added that "none of Defendants' statements show that Defendant requested counsel, as required to invoke that specific *Miranda* right." *Id.* On appeal, Rodriguez-Arvizu asserts that this conclusion was in error because it was improper for the district court to require him to "state affirmatively" that he was asserting his Fifth Amendment right to counsel.

The district court did not err in determining that Rodriguez-Arvizu did not unambiguously invoke his Fifth Amendment right to counsel. We have previously held that silence is insufficient to invoke this right. *See Jones v. Harrington*, 829 F.3d 1128, 1138 (9th Cir. 2016) ("[I]nvoking the right to counsel cannot be accomplished by silence or pantomime, but requires the suspect to articulate specifically that she wants counsel."). Even when a suspect explicitly makes a statement about wanting a lawyer but qualifies that statement with words like "maybe" or "might," we have found that such statements do not unambiguously invoke the right to counsel. *See Arnold v. Runnels*, 421 F.3d 859, 865–66 (9th Cir. 2005) (collecting cases). Notably, the Second Circuit has found that the failure to sign a waiver of rights form is not "necessarily sufficient to establish an

unambiguous invocation" of the right to counsel. *United States v. Plugh*, 648 F.3d 118, 128 (2d Cir. 2011). We agree with the reasoning of *Plugh* and conclude that Rodriguez-Arvizu's failure to sign the I-214 Form was not sufficient on its own to invoke his Fifth Amendment right to counsel.

Regardless, the district court's finding that there was no *Miranda* violation may also be affirmed because Rodriguez-Arvizu made spontaneous statements during the ride to the FBI office that reinitiated questioning, and the totality of the circumstances demonstrates that he knowingly and intelligently waived his Fifth Amendment right to counsel following this reinitiation. *See Edwards*, 451 U.S. at 484–85; *Oregon v. Bradshaw*, 462 U.S. 1039, 1044–46 (1983). The district court addressed this issue in a footnote, noting that it "would also sustain" the Government's alternative argument that there was no violation of the Fifth Amendment right to counsel "because Defendant clearly reinitiated contact with the agents by making spontaneous statements in the car ride, there was no interrogation in the car, and Defendant later waived his right to counsel." *Rodriguez-Arvizu*, 2022 WL 1164880, at *7 n.8. Although the burden is on the Government to demonstrate that, following reinitiation, an accused person has knowingly and intelligently waived the Fifth Amendment right to counsel, the Government has met that burden. *Bradshaw*, 462 U.S. at 1044. Rodriguez-Arvizu's statements in the car were not prompted by Agent Ramirez, and the FBI agents could have reasonably construed Rodriguez-Arvizu's questions, such as whether his arrest "had anything to do with Edgar," as relating to the investigation. Moreover, the agents did not question Rodriguez-Arvizu again until after he had received fresh *Miranda* warnings and expressly waived his rights.

Therefore, under this alternative ground, there was also no violation of the Fifth Amendment right to counsel.

### III. The district court did not err in denying Rodriguez-Arvizu's motion to suppress his statements under the Sixth Amendment.

Under the Sixth Amendment, "the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right attaches "when formal judicial proceedings are initiated against an individual by way of indictment, information, arraignment, or preliminary hearing." *United States v. Gouveia*, 467 U.S. 180, 185 (1984). The burden is on the Government to prove that the defendant voluntarily, knowingly, and intelligently waived this right. *Patterson v. Illinois*, 487 U.S. 285, 292, 292 n.4, 293 (1988). Determining whether a waiver was made knowingly and intelligently is a mixed question of fact and law that is reviewed de novo. *See Lopez v. Thompson*, 202 F.3d 1110, 1116 (9th Cir. 2000) (en banc).

Rodriguez-Arvizu claims that he did not voluntarily, knowingly, and intelligently waive his Sixth Amendment right to counsel because the FBI agents' violation of Rule 4(c)(3)(A) meant that he never understood why he was indicted or the purpose of the warrant. Rodriguez-Arvizu analogizes to *Fellers v. United States*, 540 U.S. 519 (2004), in which the Supreme Court held that police officers who "deliberately elicited" information from Fellers about his charged offenses, after Fellers had already been indicted and in the absence of counsel or a waiver of Sixth Amendment rights, had violated Sixth Amendment standards protecting against deliberate elicitation. 540 U.S. at 524–25. Rodriguez-Arvizu argues that "[h]ere too, Agent Ramirez withheld from Rodriguez-Arvizu that he had been indicted

and declined to provide him with any information" unless he waived his *Miranda* rights. Rodriguez-Arvizu claims that Agent Ramirez engaged in a "cat and mouse" game when he told Rodriguez-Arvizu that he was under arrest for a federal warrant but did not explain the charges in the warrant.

As an initial matter, Rodriguez-Arvizu's assertion that the facts here are "more egregious" than those in *Fellers* is mistaken. In *Fellers*, police officers—who were aware that Fellers had been indicted—went to Fellers' home with the express purpose of discussing his involvement in a methamphetamine scheme and his association with certain individuals involved in the scheme. *Id.* at 521. Fellers, who neither had counsel present nor waived his right to counsel, then told the officers that he knew the individuals and had used methamphetamine during his association with them. *Id.* The Supreme Court found that the officers had deliberately elicited this information in violation of Fellers' Sixth Amendment rights and reversed and remanded the case for further proceedings. *Id.* at 524–25. In contrast, Agent Ramirez did not say anything to Rodriguez-Arvizu that could reasonably be construed as attempting to prompt or otherwise trick him into revealing incriminating information before he waived his Sixth Amendment right to counsel. Instead, when Rodriguez-Arvizu asked Agent Ramirez during the car ride about the charges, Agent Ramirez told him, "We'll discuss that later," implying that the conversation should not continue.

Furthermore, we agree with the district court that—given the totality of the circumstances—Rodriguez-Arvizu did not need to be told that he had been indicted to validly waive his Sixth Amendment right to counsel. *Rodriguez-Arvizu*, 2022 WL 1164880, at *10. While the Supreme Court has left open the question of "whether or not an accused must be told that

he has been indicted before a postindictment Sixth Amendment waiver will be valid," *Patterson*, 487 U.S. at 295 n.8, like other circuits, we have thus far answered that question in the negative.[4]  In *Norman v. Ducharme*, 871 F.2d 1483 (9th Cir. 1989), we held that a defendant who was shown a copy of his arrest warrant, but who may not have had the opportunity to read the entire warrant, was still sufficiently apprised of "the nature of the crime for which he was being arrested and the gravity of his situation" so as to make his waiver of his Sixth Amendment right to counsel knowing and intelligent.  871 F.2d at 1487.

We reject Rodriguez-Arvizu's suggestion that there is a categorical rule that a defendant must be notified of the charges in an indictment before he can validly waive his Sixth Amendment rights.  Instead, we hold that the Sixth

---

[4] At least the Second, Third, Fourth, Seventh, and Eighth Circuits have also ruled that a defendant can knowingly and intelligently waive his post-indictment Sixth Amendment right to counsel without being first informed of his indictment.  Some circuits take a totality of the evidence approach, while others have held that a knowing and intelligent waiver of *Miranda* rights is sufficient to waive the Sixth Amendment right to counsel as well.  *See, e.g.*, *United States v. Charria*, 919 F.2d 842, 848 (2d Cir. 1990) (knowing and intelligent *Miranda* waiver also waives Sixth Amendment right to counsel even where defendant is not specifically informed of the indictment); *United States v. Muca*, 945 F.2d 88, 91 (4th Cir. 1991) (same); *Riddick v. Edmiston*, 894 F.2d 586, 590–91 (3d Cir. 1990) (defendant's waiver was valid because he knew of the murder charge and knew that New Jersey had sought extradition, plus he had been read his *Miranda* rights); *Quadrini v. Clusen*, 864 F.2d 577, 585–87 (7th Cir. 1989) (defendant's waiver was valid because he knew that he had been arrested for murder and chose to speak freely to the police after the *Miranda* warnings were given); *United States v. Chadwick*, 999 F.2d 1282, 1285–86 (8th Cir. 1993) (accused need not be informed of indictment before waiving Sixth Amendment right to counsel).

Amendment inquiry is contextual, and a waiver of the right to counsel is valid if the circumstances indicate the defendant was apprised of his rights, the criminal liability he potentially faced, and the gravity of his situation. Applying this rule here, the district court did not err in concluding that Rodriguez-Arvizu validly waived his Sixth Amendment right to counsel.

First, Rodriguez-Arvizu was repeatedly apprised of his rights. He was informed of his *Miranda* rights twice within twenty-four hours, both times in Spanish. While reviewing these rights at the FBI office, Agent Ramirez consistently asked Rodriguez-Arvizu if he understood his rights. Each time, Rodriguez-Arvizu indicated, either verbally or non-verbally, that he did.

Second, Rodriguez-Arvizu's spontaneous statements indicated that he understood both the criminal liability that he faced and the gravity of his situation. During the car ride to the FBI office, Rodriguez-Arvizu asked about the October 24, 2014, incident, indicating he knew his charges were related to his participation in the rip crew and the circumstances leading to the shooting of Amaro-Lopez. Rodriguez-Arvizu asked Agent Ramirez if he was going to get "eight years," which was the sentence another member of the rip crew had received. Rodriguez-Arvizu did not seem confused concerning whether he was going to be charged for his participation in the rip crew or, for example, a misdemeanor like simple assault. Rather, he indicated only his concern that his charges could lead to a long prison sentence.

It remains true that the simplest way for the Government to prove that a defendant voluntarily, knowingly, and intelligently waived his Sixth Amendment right to counsel is

to demonstrate that the defendant knew his specific charges. But that is not the only way to prove a valid waiver of this right.  Under the context-specific analysis articulated here, the district court did not err in determining that the Government met its burden of proving that Rodriguez-Arvizu voluntarily, knowingly, and intelligently waived his Sixth Amendment right to counsel.

**IV.  The district court did not err in denying Rodriguez-Arvizu's motion to suppress his statements based on an alleged violation of 18 U.S.C. § 3501 and the *McNabb-Mallory* rule.**

Finally, the district court did not err when it determined that Rodriguez-Arvizu's confession did not fall outside the safe harbor period of 18 U.S.C. § 3501(c).  Rule 5(a)(1)(A) of the Federal Rules of Criminal Procedure provides in relevant part that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge."  The *McNabb-Mallory* rule clarifies that if this rule is violated, an arrested person's confession is presumptively inadmissible.[5]  *See Corley v. United States*, 556 U.S. 303, 306 (2009).  *McNabb-Mallory* was modified by 18 U.S.C. § 3501(c), which created a safe harbor by stating that a confession is admissible so long as the confession was given "within six hours immediately following [the defendant's] arrest or other detention."  18 U.S.C. § 3501(c).  The rule today is that "[w]hen a criminal defendant brings a suppression motion based on *McNabb-Mallory*, the district court looks to see whether the confession was obtained within six hours of arrest.  If so, *McNabb-Mallory* does not bar its admission."  *United States*

---

[5] This rule is derived from *McNabb v. United States*, 318 U.S. 332 (1943) and *Mallory v. United States*, 354 U.S. 449 (1957).

*v. Gowadia*, 760 F.3d 989, 993 (9th Cir. 2014). If the confession occurred after six hours and before presentment, however, the court must "decide whether delaying that long was unreasonable or unnecessary[.]" *Id.* (quoting *Corley*, 556 U.S. at 322).

Rodriguez-Arvizu makes two related arguments. First, he argues that the long delay in presentment (the time between his arrest by Border Patrol agents on November 18 and his initial appearance before a federal magistrate judge on November 20) was unreasonable and unnecessary because his indictment was three years old, he had been transported more than 300 miles during that period, and the Government did not locate his arrest warrant for several hours.[6] Second, he argues that the "other detention" language in § 3501(c) means that the safe harbor clock started when he was arrested by Border Patrol agents, not the FBI, and so his confession occurred well after the safe-harbor clock had ended.

The district court rejected these arguments, finding that the relevant safe-harbor period did not begin until the FBI arrested Rodriguez-Arvizu. *Rodriguez-Arvizu*, 2022 WL 1164880, at *11–12. The district court noted that while no Ninth Circuit or Supreme Court caselaw directly addresses the issue of whether there can be independent triggers for § 3501(c)'s safe-harbor clock for unrelated federal charges, the Second Circuit has endorsed such a position. *Id.* at *12 (citing *United States v. Gonzalez*, 764 F.3d 159, 168 (2d Cir.

---

[6] The district court took judicial notice of the fact that, given the schedule of initial appearances at the federal courthouse in Tucson, the earliest possible time that Rodriguez-Arvizu could have appeared on the indictment charges was 2:00 p.m. on November 20, which is when he appeared. *Rodriguez-Arvizu*, 2022 WL 1164880, at *12.

2014) (holding that where a defendant was incarcerated on a federal immigration offense, and subsequently questioned while still in custody about unrelated federal charges for which he was not yet formally arrested, the statutory safe harbor period as to the later charges only began once he was questioned about those charges)). The district court reviewed the circumstances of Rodriguez-Arvizu's two arrests—including the fact that Border Patrol agents never questioned him about the charges in the warrant—and determined that his arrest by the FBI initiated a new six-hour clock. *Id.* at *11–12. As such, because Rodriguez-Arvizu's confession took place within six hours of his second arrest, the district court determined that there was no violation of 18 U.S.C. § 3501(c) and did not consider his arguments about unreasonable delay. *Id.*

We agree with the district court that there can be independent triggers for the statutory safe harbor clock when unrelated federal charges are at issue and that, given the circumstances of this case, the relevant six-hour clock only began to run when Rodriguez-Arvizu was arrested by the FBI. As both the Supreme Court and this court have indicated elsewhere, the statutory scheme strongly indicates that the six-hour clock must be offense-specific. Notably, Rules 5(d) and 5(e) dictate that if a defendant is charged with a felony or misdemeanor, the judge must inform the defendant of certain information related to the offenses, including the complaint or charges filed against the defendant. Fed R. Crim. P. 5(d), (e); Fed R. Crim. P. 58(b)(2). These instructions "would make no sense" without specific pending criminal charges because "the magistrate [judge] would have nothing to tell a person not yet accused or arrested." *Gowadia*, 760 F.3d at 994.

Additionally, § 3501(c) states that a confession "shall not be inadmissible solely because of [a] delay in bringing such [a] person before a magistrate judge." 18 U.S.C. § 3501(c). As the Supreme Court observed in *United States v. Alvarez-Sanchez*, 511 U.S. 350 (1994), which held that a defendant's arrest on state charges and later presentment on separate federal charges did not violate § 3501(c), "there can be no 'delay' in bringing a person before a federal magistrate [judge] until, at a minimum, there is some obligation to bring the person before such a judicial officer in the first place." 511 U.S. at 358. While *Alvarez-Sanchez* involved a state and a federal arrest, in its *Gonzalez* decision, the Second Circuit convincingly found that the same logic applies to separate federal charges. The Second Circuit noted that *Alvarez-Sanchez* "rested on the 'duty, obligation, or reason' to bring the defendant in front of a judge for a given crime" and that "the federal/state distinction simply highlighted the lack of obligation in the context of that case." *Gonzalez*, 764 F.3d at 168 (quoting *Alvarez-Sanchez*, 511 U.S. at 358). The real question in *Gonzalez* was "when the obligation arose to present appellant" regarding the non-immigration offenses about which he was later questioned. *Id.*

Applying this context-specific reasoning here, Rodriguez-Arvizu's confession at the FBI office, which took place within six hours of his second arrest, did not violate § 3501(c). Similar to the defendant's situation in *Gonzalez*, Rodriguez-Arvizu's detention up until the point of his second arrest was ostensibly on immigration charges unrelated to the charges in the outstanding warrant.[7] *Id.* As

---

[7] The magistrate judge determined that Rodriguez-Arvizu was "essentially" in custody "limbo" between the time that the Border Patrol

such, the mere discovery of the arrest warrant did not automatically trigger § 3501(c). Additionally, as the district court pointed out, Border Patrol agents never questioned Rodriguez-Arvizu about the charges in the warrant. Instead, questioning on those charges only began after the FBI agents arrested Rodriguez-Arvizu on the morning of November 20.

Therefore, because the statutory scheme supports the conclusion that there can be independent triggers for the six-hour safe harbor period for unrelated federal charges, and because the circumstances of Rodriguez-Arvizu's two arrests demonstrate that the relevant six-hour clock only began upon his formal arrest by the FBI agents rather than any earlier point, Rodrigez-Arvizu's confession took place within the safe harbor period. Accordingly, there was no

---

agent called Agent Terwilliger and the time she picked up Rodriguez-Arvizu, because he had not yet been charged with an immigration offense and there was no testimony that he ever was going to be charged with an immigration offense. *Rodriguez-Arvizu*, 2021 WL 8342942, at *41 n.17. Nonetheless, the magistrate judge found that Rodriguez-Arvizu had not raised the specific argument about whether this kind of "limbo" counts as "other detention" for the purposes of § 3501(c), and that—regardless—the point was probably moot because even if the FBI agents had picked him up on the evening of November 19, 2019, he still would have been presented to a magistrate judge the next day. *Id.* The district court did not address the magistrate judge's tentative conclusions on this point. *See Rodriguez-Arvizu*, 2022 WL 116480, at *12. Notably, Rodriguez-Arvizu does not raise this argument about custody "limbo" on appeal; rather, he continues to argue that the "other detention" language in § 3501(c) means that the safe harbor clock began when he was first arrested by the Border Patrol, not when the Border Patrol discovered the warrant and contacted Agent Terwilliger. Therefore, because Rodriguez-Arvizu does not argue that the discovery of the warrant changed the overall nature of his detention, we do not address possible disputes about the nature of his detention during that period.

violation of § 3501(c), and we do not reach the issue of unnecessary and unreasonable delay.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of the motion to suppress.

---

FORREST, J., concurring in part and concurring in the judgment:

I agree that the district court properly rejected Defendant Abelardo Rodriguez-Arvizu's motion to suppress his incriminating statements based on Rule 4(c)(3)(A), the Fifth Amendment, and the Sixth Amendment, and I join sections I–III of the majority opinion. I also agree that suppression is unwarranted under 18 U.S.C. § 3501 and the *McNabb-Mallory* rule, but I write separately on that issue because I would resolve it differently than the majority.

The majority concludes that Rodriguez-Arvizu's arrest by the FBI, not Border Patrol's discovery of his arrest warrant entered into the system by the FBI, started § 3501(c)'s safe-harbor period. In my view, there is not a clear answer for when the safe-harbor period began in this case. A confession is admissible if it was made within six hours of a defendant's "arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency." § 3501(c). As the majority notes, the Supreme Court in *United States v. Alvarez-Sanchez* explained that "there can be no 'delay' in bringing a person before a federal magistrate until, at a minimum, there is some obligation to bring the person before such a judicial officer in the first place." 511 U.S. 350, 358 (1994). In that case, the defendant

was being held on state charges when federal agents questioned him about a suspected federal crime. *Id.* at 352. The federal agents then arrested him and, the next day, presented him to a magistrate. *Id.* The Court held that § 3501(c) did not come into play until the defendant was arrested, explaining:

> If a person is arrested and held on a federal charge by "any" law enforcement officer—federal, state, or local—that person is under "arrest or other detention" for purposes of § 3501(c) and its 6–hour safe harbor period. If, instead, the person is arrested and held on state charges, § 3501(c) does not apply, and the safe harbor is not implicated. This is true even if the arresting officers . . . believe or have cause to believe that the person also may have violated federal law. Such a belief, which may not be uncommon given that many activities are criminalized under both state and federal law, *does not alter the underlying basis for the arrest and subsequent custody*. As long as a person is arrested and held *only* on state charges by state or local authorities, the provisions of § 3501(c) are not triggered.

*Id.* at 358 (emphasis added).

The majority concludes that "Rodriguez-Arvizu's detention up until the point of his second arrest was ostensibly on immigration charges unrelated to the charges in the outstanding warrant." Maj. Op. at 24. But § 3501(c) and *Alvarez-Sanchez* leave open the possibility that a

defendant may be detained for multiple unrelated offenses at the same time. Specifically, *Alvarez-Sanchez* does not address whether a newly discovered federal warrant may "alter the underlying basis" for the detention of a defendant already in federal custody. *See* 511 U.S. at 358.

The more challenging question here, therefore, is when § 3501(c)'s safe-harbor period is triggered for a defendant detained by federal authorities for one offense and then transported for questioning by a different federal authority about a different initially unknown offense. The majority answers this question by following the reasoning in *United States v. Gonzalez*, 764 F.3d 159 (2d Cir. 2014). But it turns out we need not answer this question because Rodriguez-Arvizu's confession does not warrant exclusion regardless of when the safe-harbor period began.

If his formal arrest by the FBI at around 9:45 a.m. on November 20 started the safe-harbor period, then his confession fell within the six-hour safe harbor. If the safe harbor started when Border Patrol discovered Rodriguez-Arvizu's warrant or agreed to transport him for FBI questioning, then his confession fell outside the safe harbor. But in that scenario, the *McNabb-Mallory* rule requires suppression only if the delay in presentment was "unnecessary or unreasonable." *Corley v. United States*, 556 U.S. 303, 313–14, 322 (2009); 18 U.S.C. § 3501(c). "[D]elay for the purpose of interrogation is the epitome of 'unnecessary delay.'" *Corley*, 556 U.S. at 308. By contrast, "administrative delays due to the unavailability of government personnel and judges necessary to completing the arraignment process are reasonable and necessary and therefore do not violate the prompt-presentment requirement of Rule 5(a)." *United States v. Garcia-Hernandez*, 569 F.3d 1100, 1106 (9th Cir. 2009). Similarly, whether a delay is

reasonable depends on "the means of transportation and the distance to be traveled to the nearest available . . . magistrate judge." 18 U.S.C. § 3501(c). "An overnight or weekend delay in arraignment due to the unavailability of a magistrate does not by itself render the delay unreasonable under § 3501(c)." *United States v. Van Poyck*, 77 F.3d 285, 289 (9th Cir. 1996).

Here, Border Patrol discovered Rodriguez-Arvizu's arrest warrant around 5:30 p.m. on November 19. At the FBI's request, Rodriguez-Arvizu was then transported to the Tucson Border Patrol station, where he arrived around 1:30 a.m. on November 20. Rodriguez-Arvizu was presented to a magistrate at 2:00 p.m. that day. It is undisputed that 2:00 p.m. was the earliest time on November 20 that Rodriguez-Arvizu could have been presented to a magistrate in Tucson. *See United States v. Rodriguez-Arvizu*, No. CR-15-10390-003-TUC, 2022 WL 1164880, at *12 (D. Ariz. Apr. 20, 2022). Furthermore, Rodriguez-Arvizu does not argue that there was another district in which he could have been presented earlier. And there is no evidence that the Government delayed his presentment for the purpose of interrogation. *See Corley*, 556 U.S. at 308. Rather, the record indicates that the delay occurred because of Rodriguez-Arvizu's overnight transport and the unavailability of a magistrate until 2:00 p.m. on November 20. *See* 18 U.S.C. § 3501(c); *Garcia-Hernandez*, 569 F.3d at 1106; *Van Poyck*, 77 F.3d at 289.

In sum, I would not decide precisely when the safe harbor is triggered for a person like Rodriguez-Arvizu who is held on multiple but unrelated federal charges for two reasons. The answer to this question is not clear under § 3501(c) and the Supreme Court's decision *Alvarez-*

*Sanchez*. And more important, we do not need to answer this question to decide this case.